**Rafe and Juanita SILVERSTEIN, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 71-2661.**

United States District Court, E. D. Louisiana.

Sept. 14, 1972.

Donald E. Theriot, Baton Rouge, La., for plaintiffs.

Fleming T. deGraffenried, for defendant.

ALVIN B. RUBIN, District Judge:

The sole issue is whether a transaction whereby the shareholders in a Subchapter S corporation caused corporate stock to be issued in exchange for their notes was a sham, to be disregarded for tax purposes, or whether it had the effect of increasing their basis in the corporate stock.

Taxpayers owned 60.8% of the stock of a Subchapter S Corporation, Gulf Tung Corporation, which was engaged in the business of raising and selling

tung nuts. The rest of the stock was owned by a single third person.

The corporation kept its books on a fiscal year basis, with its then current tax year ending July 31, 1966. Shortly before that date, its accountant determined that the corporation had a substantial net operating loss incurred as a consequence both of the excess of expenses over income and as a result of casualty losses resulting from Hurricane Betsy. The corporation's capital stock was shown on its balance sheet at $1,000, and the loss would exceed the stockholders' basis; [1] the loss would therefore not be deductible on their personal returns to the extent it exceeded their basis.

The corporation's accountant and lawyer both recommended to the plaintiffs and the other shareholder that they give notes to the corporation in exchange for additional stock, in order to increase their basis, and thus make the losses deductible. This was done 3 days before the end of the tax year. The new stock was issued in the same proportions as the previous stock ownership in exchange for promissory notes from the two shareholders, one for $121,600, the other for $78,400. None of the principal of either of these notes has ever been paid, and only a single interest payment in the amount of $500 has been made by the plaintiffs. Apparently no interest has been paid by the other shareholder.

The taxpayers contend that this transaction increased their basis by $121,600, so as to make the 1966 loss fully deductible. The government contends that the 1966 transaction was not a real transaction and should be disregarded; in that event the amount of the deduction would be limited to their basis prior to this transaction, $17,750. Under the circumstances, the issuance of the note must be held not to increase the taxpayers' basis and hence their claim for a refund must be denied.

## I. STATUTORY PROVISIONS

Section 1374(a) of the Internal Revenue Code permits a net operating loss of an electing Subchapter S corporation to be deducted currently on a pro rata basis by its shareholders. Section 1374(c)(2) restricts the total amount of a shareholder's pro rata share of the corporation's net operating loss that may be deducted in a particular year to the individual shareholder's "adjusted basis" of his investment in the corporation. This is defined to include only (1) his "adjusted basis" in the stock of the Subchapter S corporation, and (2) his "adjusted basis" in any indebtedness of the corporation to him. Any excess of a shareholder's pro rata share of a net operating loss that is nondeductible in the year realized because it exceeds the limitation of Section 1374(c)(2) is not deductible in any future taxable year and thus is in effect lost. The adjusted basis of the shareholder's stock and indebtedness of the corporation to him is determined as of the close of the taxable year of the Subchapter S corporation.

## II. ADJUSTED BASIS OR COST

The term "adjusted basis" is used in various provisions of the Internal Revenue Code. See Section 1011, dealing with the adjusted basis for determining gain or loss from the sale or other disposition of property, and Sections 1016, 1017, and 1018, I.R.C., dealing with adjustments to basis. Presumably these words are intended to have the same meaning in the Subchapter S provisions.

Section 1011 defines adjusted basis as the cost or other basis prescribed in section 1012 or other applicable provisions adjusted to the extent provided in Sections 1016, 1017, 1018 or as otherwise specifically provided for.

But neither statute nor regulation appears to contain any provision with respect to whether the issuance of a promissory note to a corporate entity controlled by the maker of the note, in exchange for additional stock, increases

---

[1]. The plaintiffs' basis was $17,750.

his basis in its stock. The Subchapter S statute expressly provides that basis is adjusted for debts due by the corporation to its shareholders, but there is no provision with respect to adjustment for debts due by the shareholders to the corporation. If the issuance of Gulf Tung Corporation's note to its stockholders increased their bases, it must be as a consequence of the conclusion that this transaction increased their cost.

■ The word "cost" is not defined in a technical sense in the Internal Revenue Code, although it is widely used. Wherever used, it appears to denote the dictionary meaning, "the amount or equivalent paid or charged for something" [Webster's Seventh New Collegiate]; "The outlay in expenditure (as of effort or sacrifice) made to achieve an object," or "the loss or penalty incurred in gaining something." [Ibid.] Webster's Third International treats "cost" more broadly as meaning "the amount or equivalent paid or given *or charged or engaged to be paid or given* for anything bought or taken in barter or for service rendered." (Emphasis supplied.)

The dictionary indicates, then, that the term "cost" includes both what has been paid and what has been engaged to be paid. Immediate economic outlay is not essential to cost. Goods bought on credit cost as truly as those purchased for cash—unless the buyer has no intention of paying for them. The focus is on the reality of the obligation, the substance of the transaction, not on whether the exchange of money is past or future.[2]

---

2. Indeed "basis" may be "negative." See Easson v. Commissioner of Internal Revenue, 294 F.2d 653 (9th Cir. 1961). See also Cooper, "Negative Basis," 75 Harvard L.Rev. 1352 (1962), and Wilkinson, "Depreciation and Related Basis Problems under the Income Tax Laws," 43 Tex.L.Rev. 62 (1964). But these results derive from the provisions of the statute and regulations dealing with basis for depreciation, and adjustments to basis. *Crane*, like some of the other

## III. WHAT WAS THE "COST"?

■ The surrounding circumstances here are these: The note was not given to provide the corporation with additional capital. No creditor required the corporation to increase its stockholder's equity. The corporation had no business reason to issue additional stock nor did the shareholders have any business reason to buy it. The only purpose of the transaction was to increase basis in order to create a vehicle to take a deduction.

■ The issuance of the note by the shareholders did not truly increase their indebtedness. The only substantial creditor of the corporation was a bank. Mr. Silverstein had endorsed all of the bank notes.[3] If Gulf Tung Corporation failed in its obligations, and the bank called on Gulf for payment, instead of calling on Silverstein as Gulf's endorser, the corporation would call on Silverstein—whose liability as the endorser of the bank loan would be correspondingly reduced. So the total of his real economic obligations was not affected one iota by his giving the note.

Neither Mr. Silverstein's wife nor his fellow shareholder was required to endorse Gulf Tung's bank note. The bank considered Silverstein's endorsement adequate for its purposes; the parties did not even know whether or not the other shareholder had joined in the endorsement until the court's inquiry at this trial prompted them to investigate.

No insight is gained by comparing the consequences of economically real transactions on adjusted basis. Parker v. Delaney, 1 Cir. 1950, 186 F.2d 455, like

---

depreciation cases, was concerned particularly with the definition of the term "property," and the determination of its fair market value when that constitutes the "adjusted basis."

3. Although the endorsement was only by Mr. Silverstein, the debt obligated the community of acquets and gains in which his wife was a partner. See La.Civil Code, Art. 2403.

Crane v. Commissioner of Internal Revenue, 1945, 331 U.S. 1, 67 S.Ct. 1047, 91 L.Ed. 1301 involved depreciation deductions. In each of these cases the problem was to determine the result of an indisputably real transaction. The government does not contend that cost cannot be created by the issuance of a genuine debt; it argues that the note here did not create a real economic liability, but was a sham.

■ It is unnecessary to determine in this case what the taxpayers' "cost" would have been if the shareholders had sold all of their stock and required the buyer to assume the note or had themselves agreed to satisfy it and to hold the buyer harmless. In that event the treatment of the note at the time of sale and the light, if any, this cast on the parties' intent at the date it was originally given would have to be considered. As relates to this case, the necessary determination depends on the situation at the time the note was given. Subsequent events are considered only for their evidentiary value with respect to the prior event.

The decision in Perry, 1970, 54 T.C. 1293 is distinguishable, but its rationale is applicable here. There, the taxpayer issued his demand notes to a Subchapter S corporation controlled virtually 100% by him in exchange for the corporation's long term notes, in order to create basis in "indebtedness" of the corporation within the meaning of Section 1374(c)(2)(B) of the Internal Revenue Code. The notes were issued by the taxpayer on the last day of the corporation's fiscal year in order to avail the taxpayer of his pro rata share of the corporation's net operating loss for that fiscal year. The Tax Court held that a shareholder's basis in "indebtedness" of the corporation could be created only where the shareholder had made an "actual economic outlay" to the corporation.

There was no "actual economic outlay" here. The taxpayers' advisers, solely to minimize their client's tax liability, designed an elaborate form having neither business purpose nor economic substance. Subsequent events confirm this conclusion. Interest on the note, for example, amounts to $7,296 a year, and the note has been outstanding for 6 years. Yet, of the more than $40,000 in interest apparently due, the taxpayer has paid only $500. Nothing has been paid on the principal of the note.

■ In tax matters artifice must not be exalted above reality. Gregory v. Helvering, 1935, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596. This applies equally to Subchapter S transactions, where the corporation is entirely subject to the control of shareholders. Sham transactions must be disregarded for tax purposes. W. H. Armston Co. v. C. I. R., 5 Cir., 1951, 188 F.2d 531, 533, and cases cited therein. Higgins v. Smith, 1940, 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406; Commissioner of Internal Revenue v. Court Holding Co., 1945, 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981; Minnesota Tea Co. v. Helvering, 1938, 302 U.S. 609, 58 S.Ct. 393, 82 L.Ed. 474; Gregory v. Helvering, supra; Waterman Steamship Corp. v. Commissioner of Internal Revenue, C.A.5, 1970, 430 F.2d 1185.[4]

That a taxpayer may structure his affairs so as to minimize his taxes none can doubt. Higgins v. Smith, 1940, 308

4. "If, on the other hand, the *Gregory* case is viewed as a precedent for the disregard of a transfer of assets without a business purpose but solely to reduce tax liability, it gives support to the natural conclusion that transactions, which do not vary control or change the flow of economic benefits, are to be dismissed from consideration. There is no illusion about the payment of a tax exaction. Each tax, according to a legislative plan, raises funds to carry on government. The purpose here is to tax earnings and profits less expenses, and losses. If one or the other factor in any calculation is unreal, it distorts the liability of the particular taxpayer to the detriment or advantage of the entire tax-paying group."

U.S. 473, 475, 60 S.Ct. 355, 84 L.Ed. 406; Edwards v. Chile Copper Co., 1925, 270 U.S. 452, 456, 46 S.Ct. 345, 346, 70 L.Ed. 678. The Revenue Code contains a host of provisions giving a taxpayer an election to conduct his affairs or to file his return in one fashion or another, and the taxpayer may make the choice that saves him the most money. There is neither patriotic, political nor legal obligation to pay the tax collector more than his due. But even when the taxpayer has an express election to follow alternative courses, the structure he builds must be a real one, having economic substance.

 While the existence or nonexistence of a business purpose is one litmus that may be applied to determine economic reality, the absence of business purpose is not conclusive in determining whether a transaction lacks reality. Compare W. H. Armston Co. v. C. I. R., 5 Cir., 1951, 188 F.2d 531, 533. It is apparent that a real advance to Gulf Tung Corporation might increase basis even though its purpose was not for business advantage. The deduction here is denied because it lacks economic substance, not merely because it has no business rationale.

Where there is a real transaction, the taxpayer's motives are irrelevant. But when the transaction is a sham, it must be disregarded, not because the motive is impure but because the transaction itself is a fiction. See 7 Mertens, Law of Federal Income Taxation 41B.38.

■ Neither the Commissioner nor this court is "bound to accept the form of this transaction between a corporation and its principal stockholder at face value, but [is] required to make a careful scrutiny to determine * * * [the substance of the transaction]," Limericks, Inc. v. Commissioner of Internal Revenue, 5 Cir. 1948, 165 F.2d 483, 484.

The court's conclusion constitutes no personal reflection on the taxpayers.

Their corporation suffered a real loss. They did what their advisers suggested to attempt to glean a tax benefit from that loss. The court does not therefore impugn their motives. It merely denies the tax benefit they sought to obtain.

For these reasons, judgment will be entered in favor of the defendant and against the the plaintiff, denying the refund sought.