CRABTREE, J. T. C.
Plaintiff seeks review of defendant’s determination that the sum of $56,000,000 owed by plaintiff to an affiliated corporation as of December 31, 1974 must be included in plaintiff’s net worth and 90% of the interest paid thereon disallowed for calendar year 1974 for purposes of the Corporation Business Tax Act, N.J.S.A. 54:10A — 1 et seq. The effect of defendant’s determination is to deny plaintiff’s refund claim for $68,826.77.
*599 The sole issue is whether, under the facts set forth below, all of which have been stipulated pursuant to R. 8:8-l(b), the aforesaid indebtedness of $56,000,000 was owed by plaintiff directly or indirectly to the holder of 10% or more of its outstanding capital stock within the contemplation of N.J.S.A. 54:10A — 4(d) and (k)(2)(E).
Plaintiff was incorporated as Baychem Corporation under New Jersey law on July 8, 1971. Its name was changed on July 24, 1974 to Mobay Chemical Corporation.
At all times pertinent hereto plaintiff was wholly owned, either directly or through intermediate subsidiaries, by Farbenfabriken Bayer Aktiengesellschaft (Bayer AG), a corporation organized under the laws of the Federal Republic of Germany. Plaintiff is primarily engaged in the manufacture and marketing of chemical products, including polyurethanes, thermoplastics, and synthetic fibers.
During the period 1968-1969 plaintiff’s corporate predecessors embarked upon a capital expansion program in the southern United States, the implementation of which necessitated long-term financing in the approximate amount of $100,000,000. In aid thereof plaintiff’s predecessors borrowed $25,000,000 on June 13, 1969 from The Prudential Insurance Company of America (Prudential) and Equitable Life Assurance Society of the United States (Equitable). These loans were guaranteed by Bayer AG and Bayer Foreign Investments Limited, a Canadian subsidiary. The note agreements executed in connection with the loans provided that, in seeking the remaining financing necessary to implement the contemplated expansion program, the borrowing corporations were limited to long-term debt obligations evidenced by promissory notes payable to Bayer AG or its subsidiaries. Thus, in late 1969 Bayer International Finance, N.V. (BIF), a Netherlands Antilles corporation wholly owned by Bayer AG, issued and sold on the European market $75,000,000 in aggregate principal amount of its 6% dollar bonds due November 1, 1981. By the end of 1971 $56,000,000 of the bond proceeds had been loaned by BIF to three Bayer AG subsidiaries and affiliates in the United States.
*600 On September 30, 1971, a little more than a two months after plaintiff’s incorporation, six United States affiliates of Bayer AG were merged into plaintiff, then known as Baychem. Incident to and consequent upon the merger, the indebtedness owed to Prudential and Equitable, together with the obligations of the aforementioned note agreements, were assumed by plaintiff, which also assumed the $56,000,000 obligation to BIF.
On January 1,1973 the promissory notes evidencing plaintiff’s consolidated indebtedness to BIF were purchased from BIF by Bayer Nederland B.V., a Netherlands corporation, the majority of whose outstanding stock (92.2%) was owned by Bayer AG. During the immediately preceding two years plaintiff had refinanced its assumed indebtedness to Prudential and Equitable by entering into new note agreements with those institutions on October 8, 1971 and November 15, 1972, the effect of which was (1) to extend the maturity and repayment schedule of the indebtedness incurred in 1969 by plaintiff’s predecessors and assumed by plaintiff in 1971 and (2) to increase the aggregate principal amount of the indebtedness to $50,720,000 in 1971 and $55,000,000 in 1972. As with the 1969 indebtedness, the 1971 and 1972 obligations were guaranteed by Bayer AG, and plaintiff was restricted in the issuance of long-term debt to obligations evidenced by notes payable to another member of the Bayer AG corporate family.
Meanwhile, Baychem Funding Corporation (Baychem Funding) was incorporated under New Jersey law on December 4, 1972. A wholly-owned subsidiary of Bayer AG, Baychem Funding’s sole and exclusive function was to serve as a debt financing vehicle for plaintiff in the United States in conformity with the covenants contained in the Prudential and Equitable note agreements. In particular, in 1973 Baychem Funding served as the vehicle to facilitate the refinancing of plaintiff’s indebtedness to Bayer Nederland B.V., a refinancing vehicle necessitated by the restrictions on additional long-term debt contained in the Prudential and Equitable note agreements of November 15, 1972.
*601 By Loan Agreement of April 1, 1973, Baychem Funding borrowed the aggregate sum of $56,000,000 from five New York City banks, namely, Chemical Bank, European-American Banking Corporation, First National City Bank, Mellon Bank N.A. and Morgan Guaranty Trust Company of New York (each a “bank,” collectively “the banks”). Each bank entered into a loan commitment with Baychem Funding for a specified amount, with all commitments adding up to $56,000,000, and the loans were evidenced by separate promissory notes of Baychem Funding, the aggregate principal amounts of which totalled $56,000,000. Baychem Funding used the loan proceeds to purchase plaintiff’s promissory notes from Bayer Nederland, B.V., and those notes also totalled $56,000,000 in principal amount. The Loan Agreement provided, among other things:
The Company [Baychem Funding] shall be the owner and holder of subordinated promissory notes of Baychem Corporation [plaintiff], ... in aggregate principal amount equal to the amount of the Notes to be issued by the Company to the Banks (the “Baychem Notes”), ... and shall have irrevocably instructed Bay-chem [plaintiff] to make payments on the respective Baychem Notes in a principal amount equal to the Loan of each Bank to the Company outstanding hereunder for the account of the Company as follows:
Baychem Note Bank and Account Number
B-l Chemical Bank 400-344734
B 2 European-American Banking Corporation Dll-232-9200
B-3 First National City Bank 10607746
B4 Mellon Bank N.A. 166-1142
B-5 Morgan Guaranty Trust Company of New York 601-44-858
Each Bank is hereby authorized to apply all funds in such accounts to the payment of principal and interest on the Notes then outstanding and held by it. The Company and Baychem shall have entered into a Loan Agreement to be dated as of April 1, 1972 (the “Baychem Loan Agreement”), substantially in the form of Exhibit C hereto, and Baychem shall have delivered to the Company all documents required to be delivered by Baychem pursuant to Articles II and III *602 of the Baychem Loan Agreement, and the Company shall have furnished to the Banks copies of all such documents.
Contemporaneous with the execution of the aforesaid Loan Agreement and pursuant to the terms and conditions thereof, plaintiff and Baychem Funding entered into a loan agreement dated as of April 1, 1973 (the “Mobay Loan Agreement”). Mirroring the terms and conditions of the Baychem Funding Loan Agreement of the same date, the Mobay Loan Agreement provided that Baychem Funding would make loans to plaintiff from time to time for a specified duration and in such principal amounts as plaintiff should request, up to an aggregate amount at any one time outstanding not in excess of $56,000,000. The loans thereunder were to be made by delivering to plaintiff its cancelled promissory notes in the aggregate principal amount of $56,000,000, which notes were purchased by Baychem Funding from Bayer Nederland B.V. with the proceeds of the loans made pursuant to the Baychem Funding Loan Agreement. In exchange for the cancelled notes plaintiff was to issue to Baychem Funding new promissory notes (the “Mobay Notes”), the terms and conditions of which were identical to those of the Baychem Funding Notes to the banks. Each of the Mobay Notes was unconditionally guaranteed by Bayer A.G.
Baychem Funding was precluded by the terms of its loan agreement with the banks from (1) modifying or disposing of the Mobay Notes, (2) acquiring or owning any property other than the Mobay Notes and (3) conducting any activity unrelated to the ownership of the Mobay Notes. Baychem Funding’s only significant assets were the Mobay Notes and the interest received thereon. The loan agreement also provided that (i) an event of default under the Mobay Loan Agreement was likewise an event of default under the Baychem Funding Loan Agreement, (ii) any reduction or termination of Baychem Funding’s loan commitment to plaintiff necessitated a correlative reduction or termination of the aggregate commitments of the banks to Baychem Funding and (iii) if payments on the Mobay Notes were made to Baychem Funding in a manner other than that specified in both the Baychem Funding Loan Agreement and *603 the Mobay Notes, Baychem Funding was contractually bound to “hold such payment and forthwith pay any payments so received to the Banks on demand to the extent that any principal or interest is owing on [Baychem Funding’s] Notes.”
Pursuant to the terms of both the Baychem Funding Loan Agreement and the Mobay Loan Agreement payments by plaintiff of principal and interest on its notes to Baychem Funding were effected through fund transfer notices to Mellon Bank, N.A., authorizing that institution to charge plaintiff’s account thereat in the amount of the principal, if any, and the interest thereon then due and owing on the Mobay Notes. Substantially all payments on the Mobay Notes have been applied to payment of principal and interest on Baychem Funding’s notes to the banks.
Each of the Mobay Notes was subordinated in right of payment in all respects to the notes issued to Prudential and Equitable pursuant to the Note Agreements of November 15, 1972.
The book value of Baychem Funding’s equity as of December 31, 1974 was $100,000.
The New Jersey Corporation Business Tax Act, N.J.S.A. 54:10A-1 et seq., imposes a franchise tax upon the possession or exercise of a corporate franchise in New Jersey. The tax is measured by the sum of allocable[1] net worth and net income. N.J.S.A. 54:10A-5. Indebtedness owed directly or indirectly to holders of 10% or more of the taxpayer’s outstanding capital stock is disregarded in calculating net worth. N.J.S.A. 54:10A 4(d). Similarly, 90% of the interest on such indebtedness is disallowed in the determination of net income. N.J.S.A. 54:10 A-4(k)(2)(E).
Plaintiff argues that neither N.J.S.A. 54:10A — 4(d) nor N.J. S.A. 54:10A-4(k)(2)(E) may reasonably be construed to apply to corporate indebtedness owing to unrelated third-party lenders, *604 albeit through an affiliated corporation, and to the extent that defendant’s regulations are to the contrary, they are invalid for want of statutory authority.
Defendant’s regulations, promulgated pursuant to N.J.S.A. 54:10A-27, provide, pertinently:
In the case of a creditor, corporate or otherwise (other than an individual), including an estate, trust or other entity, indebtedness, if not includible by reason of direct ownership of taxpayer’s stock by such creditor, shall be includible if both the taxpayer and the creditor are substantially owned or controlled directly or indirectly by the same interests, or where the creditor is controlled, directly or indirectly by interests, including members of the immediate family of stockholders, which in the aggregate hold ten per cent or more of the taxpayer’s outstanding shares of capital stock of all classes. For the purpose of determining the degree of stock ownership of a corporate creditor, all the shares of the taxpayer’s capital stock held by all corporations bearing the relationship of parent, subsidiary or affiliate of the corporate creditor shall be aggregated. [N.J.A.C. 18:7-4.5(d)]
[There shall be added to federal taxable income] [t]he amount deducted, in computing Federal taxable income, for interest on indebtedness (whether or not evidenced by written instrument) directly or indirectly owed to an individual stockholder or members of his immediate family who, in the aggregate, own beneficially 10% or more of the taxpayer’s outstanding shares of capital stock or to a corporate stockholder, including its subsidiaries, which owns beneficially, directly or indirectly, 10% or more of the taxpayer’s outstanding shares of capital stock, minus 10% of the amount so deducted or $1,000., whichever is larger.... [N.J.A.C. 18:7-5(aX7)]
The undisputed evidence leads to the conclusion that the $56,000,000 indebtedness in issue was owed to the five New York banks, not to Bayehem Funding, the nominal creditor. The latter is a mere conduit created and utilized for the exclusive purpose of circumventing the prohibitions contained in the 1972 loan agreements with Prudential and Equitable against additional long-term debt incurred outside the Bayer corporate family. The conclusion of Bayehem Funding’s conduit character is supported by the following facts:
1. Bayehem Funding was capitalized at $100,000, a mere bagatelle compared to the magnitude ($56,000,000) of the New York Bank loans.
2. Bayehem Funding was not permitted to own assets other than the Mobay notes, which it was not allowed to modify or transfer; nor was it authorized to conduct any business activity unrelated to ownership of the Mobay notes.
*605 3. The schedules of payment of principal and interest and the maturity dates of both the Baychem Funding notes to the Banks and the Mobay notes to Baychem Funding were identical.
4. All payments of principal and interest due on the Mobay notes were directly earmarked for the accounts of the institutional signatories of the Baychem Funding Loan Agreement.
5. If payments on the Mobay notes were made to Baychem Funding in a manner other than that specified in the governing instruments (i.e., to the banks as described in the preceding paragraph) Baychem Funding was required to remit such payments to the banks for application to Baychem Funding’s note obligations to those lending institutions.
6. Any reduction or termination of Baychem Funding’s loan commitment to plaintiff necessitated a pro tanto reduction or termination of the bank’s aggregate loan commitments to Bay-chem Funding.
7. An event of default under the Mobay Loan Agreement was defined in the Baychem Funding Loan Agreement to constitute an event of default thereunder as well.
The issue in this case is thus narrowed to an examination of the scope of the statutory basis for inclusion of indebtedness in a taxpayer’s net worth and the nondeductibility of interest thereon from a taxpayer’s net income where the indebtedness is nominally owed to an affiliated corporation. Put another way, do the facts in this case warrant the conclusion that the subject indebtedness, ultimately and substantively owed to third-party lenders, was owed indirectly to the parent corporation within the intendment of N.J.S.A. 54:10A-4?
The answer to this inquiry begins, as it often does, with ascertainment of the legislative objective. In this connection the court observed in Werner Machine Co., Inc. v. Zink, 6 N.J.Super. 188, 70 A.2d 774 (App.Div.1950):
It is clear that under the pertinent statute the legislative intendment was the imposition of a franchise tax upon all corporations doing business within New Jersey, exacting as a fee that which would result in a proportionately equal burden upon all corporations whether they operate on deficit financing or on an equity capital basis.... So that corporations holding extensive assets may not, *606 by borrowing money from large stockholders (which in reality increases their operating capital), reduce their reported net worth and avoid payment of a higher franchise tax, provision was made to include as net worth all indebtedness owing directly or indirectly to owners of ten per centum (10%) or more of the aggregate stock of the debtor corporation. [At 193, 70 A.2d 774]
Among the issues before the court in Werner Machine Co. was the tax treatment of indebtedness owing from the taxpayer to another corporation, the outstanding stock of both corporations being owned by one stockholder. Although the facts recited in the court’s opinion do not indicate the nature and source of the indebtedness, the court’s analysis of the intended scope of the phrase “indebtedness owing directly or indirectly” necessarily implies that the controlling stockholder, by whatever means, infused the funds ultimately borrowed by the taxpayer into the taxpayer’s sister corporation, which then loaned the funds to the taxpayer. The court’s reference to legislative purpose was more explicit. With specific allusion to the phrase “indebtedness owing directly or indirectly” the court said:
Its use ... is intended to provide for a situation where a stockholder, otherwise coming within the statutory language, might extend credit to the corporation either personally or through an instrumentality, managed or controlled by him, thus making such a loan includible in the tax base .... [At 194, 70 A.2d 774]
Thus, the legislative emphasis, according to the court, was on the opportunities for balance sheet manipulation resulting from corporate control. It is that manipulative opportunity, so obviously present in Werner Machine Co., that is absent in the present case. Baychem Funding was little more than a shell, being capitalized at a minute fraction of the sums borrowed from the New York Banks. It was thus impossible to transmute plaintiff’s indebtedness to Baychem Funding into equity capital without a massive infusion of funds by the parent corporation into Baychem Funding. Such infusion would constitute de facto recapitalization, not manipulation, and is manifestly not the situation contemplated by the Legislature in the enactment of N.J.S.A. 54:10A — 4(d) and (k)(2)(E).
Defendant claims that the role of the institutional lenders in the transaction must be ignored, as the indebtedness in question was owed to an affiliated corporation and that circumstance suffices to bring the transaction within the statute as construed *607 by defendant in his regulations. I must reject defendant’s argument.
Whatever the validity of the above-quoted regulations in other circumstances, the indebtedness, as I have found, was ultimately and substantively owed to third-party lending institutions, not to a corporate affiliate of the debtor. The role of that affiliate was limited by contract to that of a mere conduit, a role necessitated by restrictions in other debt instruments on financing arrangements outside the Bayer corporate family. While it is true, as defendant contends, that construction of a taxing statute by the agency charged with its administration is entitled to weight in a judicial proceeding, Public Service Elec. & Gas Co. v. Woodbridge, 73 N.J. 474, 481, 375 A.2d 1165 (1977); Container Ring Co., Inc. v. Taxation, Div. Director, 1 N.J.Tax 203, 211 (Tax Ct.1980), it is also well settled that an administrative interpretation which is inconsistent with the ordinary and primary meaning of the language of the enactment will be ignored. That is, the agency may not give the statute any greater effect than its language allows. Kingsley v. Hawthorne Fabrics, Inc., 41 N.J. 521, 197 A.2d 673 (1964). This principle is but a specific instance of the well-settled construction maxim that:
In the interpretation of statutes levying taxes it is the established rule not to extend their provisions, by implication, beyond the clear import of the language used, or to enlarge their operations so as to embrace matters not specifically pointed out. In case of doubt they are construed most strongly against the government, and in favor of the citizen. [Id. at 528-529, 197 A.2d 673; quoting from Gould v. Gould, 245 U.S. 151, 153, 38 S.Ct. 53, 53, 62 L.Ed. 211 (1917)]
Had the New Jersey Legislature intended that the mere existence of indebtedness nominally owing to a subsidiary of a common parent, without more, required the inclusion of such indebtedness in the computation of the debtor’s net worth and precluded the deduction of interest thereon in the calculation of the debtor’s net income, it could and would have explicitly so provided.
Defendant also argues that its construction of the statute is supported by 1979 legislation amending N.J.S.A. 54:10A-4(d)(5) to provide, in the case of financial business corporations, that debt owed to affiliated corporations was includible in the corpo *608 rate debtor’s net worth. This very argument was rejected by the court in Werner Machine Co., supra, wherein the court was urged to construe the legislation in light of a post-tax year amendment to N.J.S.A. 54:10A-4(e). The court concluded that “this subsequent legislation cannot affect the interpretation in the case sub judice in view of the fact that the tax assessment in 1946 was controlled by the language of the 1945 Act.” 6 N.J.Super. at 195, 70 A.2d 774. In like manner, the 1979 amendment is of no aid in construing the operative statute effective during tax year 1974.
Defendant claims that the case of General Public Loan Corp. v. Taxation, Div. Director, 13 N.J. 393, 99 A.2d 796 (1953), supports its position. In that case the taxpayer’s parent corporation made direct loans to the taxpayer, a situation which presents a paradigm of “indebtedness owing directly” to the parent corporation within the purview of the statute. The taxpayer argued that the parent borrowed from third-party sources the funds which were subsequently loaned to the taxpayer and, thus, the parent was a mere conduit, the taxpayer being actually indebted to independent commercial establishments. Our Supreme Court rejected this argument, concluding that the transactions involved came squarely within the statutory language and that taxpayer’s argument was in effect a contention that the corporate veil should be pierced to enable the taxpayer to gain a tax advantage denied to it by its own voluntary act. Quite apart from the obvious fact that the loans were made directly by taxpayer’s parent corporation and thus came squarely within the statutory language of the legislative antecedent of N.J.S.A. 54:10A-4, the court implicitly rejected the notion that taxpayer’s parent was a conduit and nothing more. The facts of General Public Loan indicate that General’s parent was a publicly-held corporation with 3,500 shareholders and that it owned other subsidiaries engaged, like General, in the small loan business. The inference therefrom that General’s parent possessed financial as well as legal substance is inescapable. Moreover, the parent’s opportunity to manipulate General’s balance sheet existed regardless of the parent’s source of the *609 funds advanced to General, a manipulation which could have been achieved without the infusion of additional capital from the parent to General. In addition, the court’s opinion discloses no such meticulous tracking arrangements between the ultimate source of the funds and the debtor corporation such as the arrangements prevailing in the case before this court among the New York banks, Baychem Funding and plaintiff.
Accordingly, the General Public Loan case is not dispositive of the issue before this court.
In summary, then it is apparent that loans between parent and subsidiary corporations are usually devoid of the ordinary safeguards obtaining between lender and borrower. This point of view undergirds the opinions of the Appellate Division and the Supreme Court in Werner Machine Co., Hawthorne Fabrics and General Public Loan, all supra. That is, although a lender may, for its own reasons, refrain from collecting the indebtedness, such forebearance, in an arms’-length situation, would be exercised for reasons other than financial interest in the debtor. Unlike the usual parent-subsidiary situation, however, such safeguards are in abundance here, and they have been detailed in great length above. The facts’ indicate that, by virtue of the Baychem and Mobay Loan Agreements, the parent corporation was unable to cause the creditor-subsidiary (Baychem Funding) to refrain from collecting the indebtedness involved. There is thus no opportunity for disguised contributions to capital, which, the cited cases tell us, is the vice at which the statute was aimed.
There remains the legal significance attributable to the guarantee by Bayer AG of the indebtedness owing from plaintiff to Baychem Funding. Arguably, Bayer AG may in effect discharge Baychem Funding’s and, hence, plaintiff’s indebtedness to the third-party lenders by causing plaintiff to default on its loan obligations, thereby rendering operative its unconditional guarantee of payment. Yet, so also may deficit financing be effected by loans from family members not of a majority *610 stockholder’s household.[2] As in the latter instance the policy objectives of the New Jersey franchise tax legislation were held in Hawthorne Fabrics not to warrant such an extension of the legislation, so also in the former instance are such policy objectives, given the clear import of the statutory language employed, insufficient to transform parent guarantees of subsidiary indebtedness to third-party lenders into “indebtedness owing . . . indirectly” from the subsidiary to the parent corporation.
Indeed, the opportunity available to a parent corporation to discharge the debt obligations of its subsidiaries will always exist merely by reason of the parent-subsidiary relationship. The existence of the guaranty of Bayer AG is thus irrelevant, for a parent corporation may always discharge the indebtedness of a subsidiary by the simple expedient of satisfying, through whatever means, the subsidiary’s debt obligations. This omnipresent opportunity does not transmute subsidiary indebtedness to unrelated third-parties into “indebtedness owing . . . indirectly” to a parent corporation.
A useful analogue is found in judicial treatment of indebtedness of a so-called “Subchapter S” corporation guaranteed by its shareholders. The federal Internal Revenue Code permits a shareholder of a “Subchapter S” corporation to deduct his allocable share of the corporation’s operating losses to the extent of the sum of his adjusted basis in his stock in the corporation and his adjusted basis of any indebtedness owed to him by the corporation. Section 1374(c)(2), IRC, 26 U.S.C.A. § 1374(c)(2). The courts have held that, for purposes of § 1374(c)(2) a shareholder may not treat loans made by third parties but guaranteed by him as loans made directly by him. Joe E. Borg, 50 T.C. 257 (1968); Milton T. Raynor, 50 T.C. 762 (1968). No indirect borrowing, whether as guarantor, surety, accommodation or otherwise, gives rise to indebtedness to a “Subchapter S” share *611 holder until he pays all or part of the obligation. Neal v. United States, 313 F.Supp. 393 (C.D.Cal.1970); Silverstein v. United States, 349 F.Supp. 527 (E.D.La.1972). See, generally, 7 Mertens, Law of Federal Income Taxation (1976 Rev.) § 41B.38.
The position of Bayer AG in the case before this court is analogous to that of the shareholder in the “Subchapter S” corporation. Given the impressive financial strength of plaintiff as indicated by the evidence, the likelihood that the parent corporation will be called upon to perform on its guaranty of plaintiff’s indebtedness, through Baychem Funding, to the New York Banks is remote. Until the parent corporation is so called upon, its own balance sheet and net worth position are unaffected by the guaranty. Put another way, until Bayer AG is required to perform on its guaranty, there is no opportunity for balance sheet manipulation of the capital required for performance of the parent’s obligation under the guaranty.
The court is aware of Fedders Financial Corp. v. Taxation, Div. Director, 3 N.J.Tax 576 (Tax Ct.1981), and Skyline Industries, Inc. v. Taxation, Div. Director, 3 N.J.Tax 612 (Tax Ct.1981), cases recently decided by Judge Andrew. The loan in Fedders was made by a substantially capitalized subsidiary of the taxpayer with the proceeds of the sale of debentures, which were convertible into common stock of taxpayer’s parent company. That convertibility feature, along with other facts in the case, indicated that the subsidiary was merely the alter ego of the parent company. In Skyline the only issue was whether loans made to the taxpayer prior to its affiliation with the parent company warranted a conclusion that the indebtedness, which was directly owed to an affiliate, was owed directly or indirectly to the parent company within the meaning of the statute. In neither case was there any indication of a direct and immediate connection between the creditor-corporation and third-party lenders. The status of the thinly capitalized creditor affiliate in the instant case as a bare conduit for the third-party lenders is the primary feature distinguishing the Mobay-Baychem relationship from the corporate relationships prevailing in Fedders and Skyline.
*612 Judgment will be entered granting plaintiff’s claim for refund.

AJlocation of plaintiffs net worth and net income to New Jersey is not in issue.

N.J.S.A. 54:10A-^4(e) defines the phrase “indebtedness owing directly or indirectly” to include all indebtedness owing to any stockholder or shareholder and to members of his immediate family where those individuals, in the aggregate, own 10% or more of the taxpayer’s outstanding capital stock.