SANFORD P. BURNSTEIN and IRENE BURNSTEIN, et al., [1] Petitioners, v. COMMISSIONER OF INTERNAL REVENUE, Respondent Burnstein v. Commissioner
Docket Nos. 16200-79, 18455-80, 18493-80.
United States Tax Court
T.C. Memo 1984-74; 1984 Tax Ct. Memo LEXIS 607; 47 T.C.M. (CCH) 1100; T.C.M. (RIA) 84074; February 13, 1984. Lowry McKee, for the petitioners. LeRoy D. Boyer and Joan B. Renegar, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: Respondent determined deficiencies in Federal income taxes against petitioners as follows: Docket No.
Year
Deficiency
Sanford P. Burnstein
16200-79
1974
$19,527.15
and Irene Burnstein
1975
31,161.54
1976
4,906.98
James W. Boy and
18455-80
1974
8,740.00
Virginia C. Boy
1975
15,494.00
1976
6,209.00
Thomas E. Boy and
18493-80
1974
8,740.00
Patricia R. Boy
1975
12,737.00
1976
1,956.00
These cases have been consolidated for trial, briefing, and opinion. Petitioners have conceded certain adjustments made in the notices of deficiency. The issues remaining for decision are: (1) Whether petitioners are entitled to claimed deductions in 1974 and 1975 under section 1374[2] for their share of net operating losses sustained *609 by a subchapter S corporation, National Jets, Inc., in which they were stockholders. (2) Whether petitioners Sanford P. Burnstein and Irene Burnstein are entitled to a long-term capital loss as a result of the 1976 redemption of their stock in National Jets, Inc.; and (3) Whether petitioners Sanford P. Burnstein and Irene Burnstein may deduct a payment to Concare Aircraft Leasing Corporation in 1976 in the amount of $116,707.42 as a loss from a transaction entered into for profit under section 165(c)(2). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners Sanford P. Burnstein (Burnstein) and Irene Burnstein resided in Tulsa, Oklahoma, at the time they filed their petition in the instant case.They filed their Federal income tax returns for the taxable years 1974, 1975, and 1976 with the Internal Revenue Service Center, Southwest Region, Austin, Texas. Petitioners James W. Boy and Virginia *610 C. Boy resided in Fort Lauderdale, Florida, at the time they filed their petition in the instant case. They filed their Federal income tax returns for the taxable years 1974, 1975, and 1976 with the Internal Revenue Service Center, Southeast Region, Atlanta, Georgia. Petitioners Thomas E. Boy and Patricia R. Boy resided in Fort Lauderdale, Florida, at the time they filed their petition in the instant case. They filed their Federal income tax returns for the taxable years 1974, 1975, and 1976 with the Internal Revenue Service Center, Southeast Region, Atlanta, Georgia. During 1974, 1975, and until March 25, 1976, Sanford Burnstein owned 50 percent and James W. Boy and Thomas E. Boy (the Boy brothers) each owned 25 percent of the outstanding common stock of two small business corporations, Concare Aircraft Leasing Corporation (Concare) and National Jets, Inc., (National). (Burnstein and the Boy brothers will hereinafter be referred to as "petitioners.") The number of shares owned by each of the petitioners in Concare and National and the original consideration paid in cash for the shares were as follows: Concare
National
No. of
No. of
Shareholder
Shares
Consideration
Shares
Consideration
Sanford P. Burnstein
500
$500
500
$500
James W. Boy
250
250
250
250
Thomas E. Boy
250
250
250
250
Total
1,000
$1,000
1,000
$1,000
*611 The petitioners were officers in Concare and National during the years in issue as follows: Concare
President
Sanford P. Burnstein
Vice-President
James W. Boy
Secretary-Treasurer
Thomas E. Boy
National
President
Sanford P. Burnstein
Secretary
James W. Boy
Treasurer
Thomas E. Boy
Concare was incorporated on October 16, 1967, and elected to be treated as a small business corporation on February 24, 1969. It adopted a fiscal year ending January 31. Concare is in the business of purchasing, selling, and leasing used aircraft and aircraft parts. National was incorporated on July 19, 1974, and, on the same date, elected to be treated as a small business corporation. It adopted a calendar year. National is in the business of owning and operating Lear Jet Aircraft for a passenger charter service. National was organized by the petitioners as a separate corporation from Concare for valid business reasons. All aircraft owned by a passenger charter service must be certified by the Federal Aviation Administration. Since Concare's business involved the purchase, sale, and lease of aircraft which would otherwise not require such certification, *612 petitioners incorporated National to operate the charter service. Concare advanced $131,535.84 to National in 1974, and $98,879 in 1975. These funds were used to pay for some of National's expenses such as supplies, tires, and other operating and naintenance expenses. None of these funds were transferred from petitioners' personal bank accounts. National did not give Concare any promissory notes nor pledge any collateral as a result of the funds transferred in 1974 and 1975. In addition, Concare did not set up a repayment schedule nor charge National any interest in connection with the funds advanced. National paid no interest on these funds and Concare made no demand for repayment. When the funds were transferred from Concare to National in 1974 and 1975, they were recorded on the books of Concare as an account receivable due from National, and on the books of National as an account payable. During the years in issue, John D. Schuler, a certified public accountant, prepared income tax returns and financial statements for National and Concare. As part of his duties, he was authorized to make adjusting and closing entries to the books of National and Concare for the purpose *613 of preparing such returns and statements. Mr. Schuler made adjusting journal entries to the books of National as of December 31, 1974 and December 31, 1975 which reclassified the funds transferred by Concare to National as accounts payable due petitioners, as follows: Accounts Payable
12/31/74
12/31/75
Due Sanford P. Burnstein
$65,767.92
$49,439.50
Due James W. Boy
32,883.96
24,719.75
Due Thomas E. Boy
32,883.96
24,719.75
Total
$131,535.84
$98,879.00
Mr. Schuler made corresponding adjusting journal entries to the books of Concare as of December 31, 1974 and January 31, 1976 which reclassified the funds transferred by Concare to National as accounts receivable due from petitioners as follows: Accounts Receivable
12/31/74
1/31/76
Due from Sanford P. Burnstein
$65,767.92
$50,939.50
Due from James W. Boy
32,883.96
25,469.75
Due from Thomas E. Boy
32,883.96
25,469.75
Total
$131,535.84
$101,879.00
The financial statements of Sanford Burnstein for the period ending June 30, 1975 and September 30, 1975 report an indebtedness from National to Burnstein of $65,768. National did not give petitioners any promissory notes *614 nor pledge any collateral as a result of the funds transferred by Concare to National in 1974 and 1975. In addition, petitioners did not set up a repayment schedule nor charge National any interest in connection with the funds advanced. Concare made no demand for repayment either upon National or upon petitioners and petitioners made no demand for payment upon National as a result of the funds transferred by Concare to National. During 1974 and 1975, no payments on the amounts transferred by Concare to National were made to Concare or to the petitioners by National. National experienced a net operating loss of $57,387.78 in 1974 and $95,572.39 in 1975. In his notice of deficiency, respondent disallowed petitioners' claimed share of these losses since he determined that petitioners' adjusted bases in National stock and indebtedness of National to them was not sufficient to cover such losses. In 1976, petitioner Burnstein's stock in National was redeemed by National for $73,627.34 cash. The redemption price was determined as follows: Amount paid for capital stock
$500.00
Additions: Account receivable at 12/31/75
115,207.42
Increase in agreed value of Lear
Jet owned by National: Value at 12/31/75
$440,000.00
Value per books
371,200.00
68,800.00
One-half
x.5
34,400.00
$150,107.42
Deductions: Losses of National
1974
57,387.78
1975
95,572.39
152,960.17
One-half
x.5
76,480.08
Redemption price
$73,627.34
*615 On April 13, 1976, the petitioners each paid in full to Concare the following amounts which were recorded on Concare's books as accounts receivable from them: Sanford P. Burnstein
$116,707.42
James W. Boy
58,353.71
Thomas E. Boy
58,353.71
Petitioner Burnstein drafted a check to Concare for $167,064.95 which included the above-noted payment of $116,707.42. Concare did not make a demand upon Burnstein to make such payment, and Burnstein had no obligation to write the check. OPINION During 1974 and 1975, petitioners owned all of the stock in two subchapter S corporations (Concare and National) in the same proportions. Concare advanced funds to National in 1974 and 1975 and National experienced net operating losses in each of those years. The primary question we must resolve herein is whether petitioners' bases in National for purposes of section 1374(c)(2)(B) should include the amounts advanced by Concare to National. Petitioners maintain that Concare made the advances on behalf of its shareholders and thus the transaction in substance was a transfer of funds from Concare to petitioners who in turn transferred the funds to National. Therefore, petitioners *616 contend that the amounts owed by National as a result of the advances were actually owed to the shareholders in proportion to their ownership interests and should be taken into account in determining the amount of National's net operating loss that petitioners may deduct. Respondent asserts, however, that since the amounts were advanced by Concare to National, any debt created was not an indebtedness of National running to the petitioners within the meaning of section 1374(c)(2)(B). Therefore, he contends that petitioners' bases should not include the amounts advanced. We agree with respondent. As applicable to the years herein, section 1374 allowed each shareholder of an electing small business corporation a deduction for his pro rata share of the corporation's net operating loss for any taxable year. [3]Section 1374(c)(2) limits the deductible portion of a shareholder's proportionate loss to: (A) the adjusted basis (determined without regard to any adjustment under section 1376 for the taxable year) of the shareholder's stock in the electing small business corporation, determined *617 as of the close of the taxable year of the corporation * * * and (B) the adjusted basis (determined without regard to any adjustment under section 1376 for the taxable year) of any indebtedness of the corporation to the shareholder, determined as of the close of the taxable year of the corporation * * *. [Emphasis added.] It is well settled that adjusted basis in an electing corporation's indebtedness under section 1374(c)(2)(B) is indebtedness which runs directly to the electing corporation's shareholders and that borrowings from an entity in which the shareholders of the subchapter S corporation have substantial or even identical ownership interests do not qualify. Frankel v. Commissioner,61 T.C. 343 (1973), affd. without opinion 506 F.2d 1051 (3d Cir. 1974); Prashker v. Commissioner,59 T.C. 172 (1972); *618 Robertson v. United States, an unreported case ( D. Nev. 1973, 32 AFTR 2d 73-5556, 73-2 USTC par. 9645). In Frankel, we held that indebtedness owed by a subchapter S corporation to a partnership does not qualify as indebtedness to its shareholders, even though the shareholders were partners in the partnership and their ownership interests in both entities were in the same proportions.We stated (61 T.C. at 348): It is not the proportionability of ownership interests that is determinative. Rather, it is the crucial fact that the partnership made the loan and the partners, to the extent of their partnership interest, participated therein. If the corporation should default on the loan its effects will be felt by the partners as creditors rather than the partners as shareholders. The existence of the partnership cannot be ignored here even though the partners were simultaneously shareholders in the subchapter S corporation. If the partners had directly loaned the money to the subchapter S corporation or treated it as an addition to capital, the result would be different. See Ruth M. Prashker,supra at 176. Similarly, where the sole beneficiary *619 of an estate was the stockholder of a subchapter S corporation owing a debt to the estate, we denied the shareholder the loss pass through because the debt did not run directly to her. Prashker v. Commissioner,supra.Where a trust is owed a debt by a subchapter S corporation and a shareholder of the corporation has a one-half interest in the trust, the debt runs to the trust and not to the shareholder. Robertson v. United States,supra.
Petitioners rely heavily on Burnstein's testimony that when they caused Concare to transfer money to National, they intended and believed they were actually transferring their own money.Petitioners also point out that since Concare had no financial interest in National, the funds were obviously advanced on behalf of the shareholders. Thus, they argue that made the necessary economic outlay which allows them to acquire a basis in the indebtedness from National. Petitioners' argument is without merit and contrary to the judicial interpretation of section 1374(c)(2)(B). Petitioners' view that the funds transferred by their corporation on their behalf were actually their own would effectively disregard Concare as a separate *620 entity. Despite many "pass-through" privileges and other tax benefits enjoyed by shareholders of subchapter S corporations, the corporate entity still must be respected. Indebtedness running from a subchapter S corporation to a partnership (Frankel), estate (Prashker), and trust (Robertson), is not attributed to shareholders of a S corporation who have substantial or identical ownership interests in such entities. The same result must apply in the situation herein where both entities are subchapter S corporations. For the debt to be included in the shareholder's basis under section 1374(c)(2)(B), the shareholder must make an actual economic outlay and directly incur the indebtedness. Underwood v. Commissioner,63 T.C. 468, 476 (1975), affd. 535 F.2d 309 (5th Cir. 1976); Frankel v. Commissioner,supra at 349. The shareholders' belief that they were actually incurring the risk is irrelevant. As we stated in Frankel (61 T.C. at 349-350): The "concept of indebtedness of the corporation to the shareholders *621 as employed in the statute was intended to be comparable to actual capital investment by the shareholders," Wheat v. United States,353 F. Supp. 720, 722 (S.D. Tex. 1973). This indebtedness must run directly to the shareholder. The language of the statute is clear as to this requirement. That the actual debt basis should be determined on the basis of risk and its effects has not been proposed legislatively. * * * The situations where the indebtedness has been guaranteed, or runs directly to a trust or an estate, have all resulted in a denial of the loss passthrough to the extent of the debt. We think that a loan made by a partnership to the subchapter S corporation should receive the same treatment. If Congress should deem it appropriate to change the language of section 1374 so as to permit the risk of the debt to be the determinative factor in locating the proper subject for the basis adjustment, then fewer individuals would be caught in this trap for the unwary. However, where the language of the statute is clear and unambiguous, it is entirely reasonable to infer that Congress deliberately intended the benefits of the subchapter S election to rest directly *622 with those individuals who were the shareholders of their corporation. Where such direct language is used, we think the benefits of the pass-through are available only to those who satisfy the statutory requirements. Failure to do so will result in the loss of the benefit. See Hauptman v. Director of Internal Revenue,309 F.2d 62, 65 (C.A. 2, 1962); Hewitt, "Some Intriguing Recent Developments in Subchapter S," 44 Taxes 848, 850 (1966) ("serious detriment to the taxpayer pervades the subchapter, and without constant and expert counsel [its] 'simplicity' * * * can change into nightmarish, if not ruinous, complexity.") [Footnote references omitted.] The record is unclear as to why Concare made the advances. Concare may have had sound business reason for doing so. Even if they were made on the shareholders' behalf, there certainly is no basis upon which to conclude that Concare was an agent or mere conduit of the petitioners. [4] Thus, the indebtedness here simply did not run to the shareholders so as to qualify under section 1374(c)(2)(B). [5]
*623 Petitioners insist, however, that they made the necessary economic outlay to acquire a basis in the amount of funds transferred by Concare to National by later assuming responsibility to repay such amount to Concare. We reject such contention. The transfers were initially recorded on the books of Concare as accounts receivable due from National and on the books of National as accounts payable due Concare. Thus, at the time of such advances, National was not indebted to petitioners and we do not believe that petitioners ever assumed any obligation to repay such debt. All petitioners really did was make journal adjustments at the end of each year (when it could be determined that National would have a net operating loss) to reclassify the transferred funds on the books of Concare as accounts receivable due from petitioners and on the books of National as accounts payable due petitioners. See Silverstein v. United States,349 F. Supp. 527 (E.D. La. 1972). In any event, such reclassification is insufficient to create an "indebtedness of the corporation to the shareholder" within the meaning of section 1374(c)(2)(B). See Underwood v. Commissioner,supra; *624 Perry v. Commissioner,54 T.C. 1293 (1970), affd. per order (8th Cir. 1971). In Underwood, petitioners owned all the stock in two corporations, one profitable and the other (a subchapter S corporation) unprofitable. The profitable corporation made loans to the unprofitable corporation. The debt between the two corporations was subsequently cancelled when petitioners gave a note to the profitable corporation and the unprofitable corporation gave a note to petitioners. We held that the subchapter S corporation's execution of a note to petitioners was not sufficient to give petitioners an adjusted basis in the indebtedness under section 1374(c)(2)(B) and that the only effect of the exchange of notes "was to shift the liabilities for the prior loans." 63 T.C. at 475. We reasoned that the situation was similar to a shareholder's guarantee of the indebtedness of a subchapter S corporation: In a long list of cases, it has been held that basis-giving indebtedness for the purposes of section 1374(c)(2)(B) does not arise where a shareholder merely guarantees *625 a subchapter S corporation's debt, William H. Perry,supra at 163; Milton T. Raynor,50 T.C. 762, 770-771 (1968); Wheat v. United States,353 F. Supp. 720, 722 (S.D. Tex. 1973); Neal v. United States,313 F. Supp. 393, 396 (C.D. Cal. 1970), or executes a surety agreement with respect to the corporation's debt. Joe E. Borg,50 T.C. 257, 264-265 (1968). Only after the guarantor or surety performs on his contract of guaranty does the debtor's liability to the creditor become an indebtedness to the guarantor. Putnam v. Commissioner,352 U.S. 82, 85 (1956); William H. Perry,supra at 164. Significantly, it is the payment by the guarantor of the guaranteed obligation that gives rise to indebtedness on the part of the debtor to the guarantor. The mere fact that the debtor defaults and thereby renders the guarantor liable is not sufficient. Similarly, the fact that Albuquerque executed a $110,000 note to Underwood is not sufficient to give him an adjusted basis in indebtedness within the meaning of section 1374(c)(2)(B). He has paid out nothing for that note. He had merely promised *626 to pay the $110,000 to Lubbock. For the purposes of section 1374(c)(2)(B), the unpaid note was no different from the liability of a guarantor upon default by the primary obligor or from the liability for an unpaid stock subscription. Until the guarantor or the subscriber has paid his obligation, he has made no actual investment. The adjusted basis for indebtedness referred to in section 1374(c)(2)(B) is "intended to be comparable to actual capital investment by the shareholders," Wheat v. United States,supra at 722, or, stated another way, is limited to "the actual economic outlay of the shareholder," William H. Perry,54 T.C. 1293, 1296 (1970), affirmed per order (C.A. 8, May 12, 1971). [63 T.C. at 475, 476.] Assuming again, that the adjusting entries reflected what actually happened, out situation is governed by Underwood and the transaction did not give petitioners an adjusted basis in indebtedness within the meaning of section 1374(c)(2)(B). [6]
*627 Finally, petitioners argue that since they could have used the circuitous route of borrowing the money from Concare and thereafter transferring it to National instead of having Concare make the loan direct to National, the loans should be considered their own personal obligations. Again, we disagree. "A transaction is to be given its tax effect in accord with what actually occurred and not in accord with what might have occurred." See Don E. Williams Co. v. Commissioner,429 U.S. 569, 579-580 (1977); Brown v. Commissioner,706 F.2d 755 (6th Cir. 1983), affg. a Memorandum Opinion of this Court; see also Television Industries, Inc. v. Commissioner,284 F.2d 322, 325 (2d Cir. 1960), affg. 32 T.C. 1297 (1959). In Prashker v. Commissioner,59 T.C. 172 (1972), we stated: We must view this case not with an eye to what could have been done but rather what was in fact done. Hence the key question is whether or not the debt of the corporation runs "directly to the shareholder." The loan must in fact have been *628 made by the shareholder and not merely guaranteed by him. See William H. Perry,47 T.C. 159 (1966), affd. 392 F.2d 458 (C.A. 8, 1968); Rev. Rul. 69-125, 1969-1 C.B. 207. This, of course, does not rule out the possibility that a shareholder could borrow the money personally and then loan the money to the corporation. In that event the corporation's debt would run directly to the shareholder. See Seven Sixty Ranch Co. v. Kennedy, ( D. Wyo. 1966, 17 A.F.T.R. 587, 66-1U.S.T.C. par. 9293). Clearly there must be a debt running directly to the shareholder in order to permit the deduction from income of a corporate net operating loss. [59 T.C. at 176.] See also Cornelius v. Commissioner,58 T.C. 417, 422 (1972), affd. 494 F.2d 465 (5th Cir. 1974) where we quoted, in the context of subchapter S, the statement articulated in Legg v. Commissioner,57 T.C. 164, 169 (1971): "[a] taxpayer cannot elect a specific course of action and then when finding himself in an adverse situation extricate himself by applying the age-old theory of substance over form." The *629 same principle applies herein. Petitioners, for reasons not shown in the record, chose to have Concare advance the funds to National. We cannot now alter the form of the transaction. See Perry v. Commissioner,54 T.C. 1293, 1296 (1970), affd. per order (8th Cir. 1971). Accordingly, we hold that under the transaction herein, there was no indebtedness which increases petitioners' bases under section 1374(c)(2)(B) for the purpose of determining the amount of National's net operating loss which petitioners may deduct in 1974 and 1975. [7]
*630 Alternative Claims by Petitioners Burnstein for 1976
Petitioners Burnstein in an amendment to their petition, have offered two additional contentions with respect to their 1976 taxable year. Initially, they claim that even if the indebtedness from National did not constitute an adjustment to basis for purposes of deducting Burnstein's share of National's net operating losses for 1974 and 1975, it should increase his basis in his National stock in order to determine the amount of gain on redemption of his National stock in 1976. For reasons discussed above, this argument must fail. The debt ran from National to Concare and Burnstein's status as a shareholder in both corporations involved in the transaction does not warrant an increase in basis with respect to his National stock, either under section 1374(c)(2)(B) or under sections 1011 and 1012. The Burnsteins next claim that they are entitled to a loss deduction under section 165(c)(2) as a result of Burnstein's payment of $116,707.42 to Concare in 1976. This contention is meritless. While Burnstein has proven that he made such payment, he has failed to prove that such payment resulted in a loss to him. There was no *631 completed transaction fixed by an identifiable event within the 1976 taxable year. See section 1.165-1(d)(1), Income Tax Regs.; Montana National Bank of Billings v. Commissioner,12 B.T.A. 22 (1928); see generally 5 Mertens, Law of Federal Income Taxation, sec. 28.15 (1980 rev.). Burnstein has not demonstrated that he sustained a loss therewith. The payment was made to a corporation in which Burnstein owned a 50 percent interest. [8] At best, the payment was a capital contribution to Concare and recognition of any gain or loss would have to await disposition of the stock. We thus deny the Burnsteins' claims with respect to their 1976 taxable year.
Decisions will be entered for the respondent.
Footnotes
1. Cases of the following petitioners are consolidated herewith: James W. and Virginia C. Boy, docket No. 18455-80; Thomas E. Boy and Patricia R. Boy, docket No. 18493-80.↩
2. Unless otherwise noted, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years at issue.↩
3. Congress has recently enacted the Subchapter S Revision Act of 1982, Pub. L. 97-354, 96 Stat. 1669, substantially revising the provisions of Subchapter S. However, that Act has no application to the years before us.↩
4. See Lee v. Commissioner,T.C. Memo. 1976-265↩. 5. Respondent argues that the advances from Concare to National lacked any indicia of indebtedness, i.e. repayment schedule, note, rate of interest, and thus did not even constitute a true debt. We assume, however, for purposes of this case that a debt was created but rest our holding on the basis that any indebtedness did not run directly to the shareholders within the intendment of sec. 1374(c)(2)(B)↩.
6. Petitioners made payment to Concare in 1976 which they claim was in satisfaction of their obligation to repay the advances. Even if such contention were true and analyzing this situation in terms of a guarantee, the payment made in 1976 would still not give petitioners enough bases as of the close of the 1974 and 1975 taxable years to deduct their share of National's net operating losses for those years. See Underwood v. Commissioner,63 T.C. 468 (1975), affd. 535 F.2d 309 (5th Cir. 1976); Perry v. Commissioner, 47 T.C. T.C. 159, 164 (1966), affd. 392 F.2d 458↩ (8th Cir. 1968).
7. Petitioners argue further that their assumption of the indebtedness constituted indirect contributions of capital to National and thereby provides sufficient bases for deduction of National's losses. Maurer, Inc. v. Commissioner,30 T.C. 1273 (1958). We cannot agree. The courts have repeatedly stated that sec. 1374(c)(2) is concerned with a shareholder's actual economic outlay. Underwood v. Commissioner,supra at 476; Perry v. Commissioner,54 T.C. 1293, 1296 (1970), affd. per order (8th Cir, 1971); Wheat v. United States,353 F. Supp. 720, 722-723↩ (S.D. Tex. 1973).
8. As noted in our findings of fact, the shareholders made payments to Concare on the same date exactly proportional to their shareholdings in Concare.↩