MORRIS G. UNDERWOOD, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

JACKIE UNDERWOOD, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2882-73, 2883-73.    Filed January 27, 1975.

*Edward R. Smith,* for the petitioners.
*D. Derrell Davis,* for the respondent.

FEATHERSTON, *Judge:* In these consolidated cases, respondent determined deficiencies in petitioners' Federal income taxes for 1969 in the following amounts:

| Petitioner | Docket No. | Deficiency |
|---|---|---|
| Morris G. Underwood | 2882-73 | $4,286.24 |
| Jackie Underwood | 2883-73 | 4,302.42 |

The only issue for decision is whether petitioners, on their Federal income tax returns for 1969, properly deducted their respective shares of the net operating loss incurred by an electing small business corporation. The answer depends upon (1) whether the corporation's execution of a promissory note to petitioners gave them an "adjusted basis" in "indebtedness" within the meaning of section 1374(c)(2)(B),[1] and (2) whether respondent is estopped to contend that it did not.

### FINDINGS OF FACT

Morris G. Underwood (hereinafter Underwood) and Jackie Underwood, husband and wife (referred to jointly hereinafter as petitioners), were residents of Lubbock, Tex., at the time they filed the petitions herein. They filed separate individual Federal income tax returns for the calendar year 1969, using the cash method of accounting. All of their income, notes, and stock here involved were community property.

During all pertinent years, petitioners were the sole shareholders of Underwood's of Lubbock, Inc. (hereinafter referred to as Lubbock), a corporation engaged in the retail barbecue cafeteria business located in Lubbock, Tex.

In January 1965, petitioners organized another retail barbecue cafeteria business, Underwood's of Albuquerque, Inc. (hereinafter referred to as Albuquerque). As of May 1966, Albuquerque elected to be taxed as a small business corporation under subchapter S of the Internal Revenue Code of 1954, sections 1371-1379. Petitioners became the sole shareholders of Albuquerque as of June 1, 1966, and continued to be so through April 30, 1969.

Lubbock filed its income tax returns using the accrual method of accounting and a fiscal-year ending August 31. Albuquerque filed its income tax returns using the accrual method of accounting and a fiscal year ending April 30.

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue, unless otherwise noted.

For the period prior to its election to be taxed as a small business corporation, Albuquerque's tax returns reflected the following operating results:

| FYE Apr. 30— | Gain (or loss) |
|---|---|
| 1965 | 0 |
| 1966 | ($82.49) |

As a small business corporation, Albuquerque's operations reflected the following results:

| FYE Apr. 30— | Gain (or loss) |
|---|---|
| 1967 | ($4,003.05) |
| 1968 | (51,815.94) |
| 1969 | (13,054.74) |
| 1970 | (11,331.62) |

Lubbock's operations during its fiscal years ended August 31 of 1965 through 1970 consistently resulted in profits.

During the period January 1965 to October 1966, Lubbock made loans to Albuquerque totaling $110,000, in order to help finance the latter's operations. In return, Albuquerque executed a series of demand promissory notes to Lubbock, each bearing 6-percent interest.

Interest due from Albuquerque on its notes was regularly accrued on Lubbock's books as interest income and was consistently reported as such on its income tax returns. Albuquerque's books similarly reflected accruals for interest expense incurred on the loans extended to it by Lubbock.

Albuquerque made no payments of principal or interest on these notes to Lubbock until April 1968, when it paid Lubbock $6,980, which represented the total amount of interest which had accrued on the notes as of January 31, 1967.

Ray Lawrence (hereinafter Lawrence) is and has been the C.P.A. for the Underwood interests since about 1953. Sometime prior to January 31, 1967, Lawrence discussed with Underwood the matter of anticipated losses of Albuquerque for its fiscal year ended April 30, 1967. Lawrence advised Underwood that losses in Albuquerque could well exceed Underwood's adjusted basis in that corporation's stock in the near future and that, therefore, Underwood should consider steps which would increase his basis in Albuquerque's stock or indebtedness, thereby enabling him to deduct such losses for tax purposes.

At the time this discussion was held, Lubbock was not actively engaged in any expansion program for which it needed the funds previously lent to Albuquerque.

As a result of the discussion between Lawrence and Underwood, the following transactions occurred: (1) Lubbock surrendered its Albuquerque notes to Albuquerque, marking them "paid" as of January 31, 1967; (2) Albuquerque issued a demand promissory note to Underwood dated January 31, 1967, in the amount of $110,000, bearing 6-percent interest per annum; (3) Underwood gave his personal demand note to Lubbock dated January 31, 1967, in the amount of $110,000, bearing 6-percent interest per annum.

Thereafter, the books and records of Lubbock and Albuquerque reflected the ownership of the new notes and cancellation of the original notes in conformity with the transactions described above.

Interest due on the note Underwood executed to Lubbock was regularly accrued and reported for income tax purposes by Lubbock from and after January 31, 1967. Actual payments of interest to Lubbock were made by Underwood on April 11, 1968, December 15, 1969, and March 6, 1970. The note was paid in full on March 27, 1970.

On the note Albuquerque issued to Underwood on January 31, 1967, no principal or interest had been actually paid as of April 30, 1972.[2]

As of April 30, 1967, petitioners' adjusted basis in Albuquerque stock was $13,000. On their joint Federal income tax return for 1967, petitioners claimed a combined total of $3,695.22 of Albuquerque's April 30, 1967, fiscal year loss of $4,003.05,[3] which left them a remaining basis of $9,304.78 in Albuquerque stock. On their joint Federal income tax return for 1968, peti-

[2] On Apr. 9, 1968, Underwood loaned Albuquerque an additional $22,377.50. As of that date, Albuquerque's books reflected principal debts to Underwood in the amount of $132,377.50. Albuquerque repaid principal on this subsequent loan in the amounts of $7,000 on Oct. 14, 1968, and $5,000 on Dec. 12, 1968.

[3] Another shareholder, Jacqueline Underwood, owned some of the stock in Albuquerque as of the beginning of Albuquerque's fiscal year ended Apr. 30, 1967. Her stock ownership ceased June 1, 1966, at which time petitioners became the sole shareholders. Jacqueline Underwood's pro rata share of Albuquerque's net operating loss for its fiscal year ended Apr. 30, 1967, was determined to be $308.28. This figure, when combined with the amount of Albuquerque's fiscal 1967 loss claimed by petitioners, totals $4,003.50, instead of $4,003.05, the correct amount of loss as reflected on Albuquerque's tax return for that taxable year.

tioners claimed all of Albuquerque's losses in the amount of $51,815.94 for its fiscal year ended April 30, 1968.

After deducting $9,304.78 of Albuquerque's April 30, 1968, net operating loss on their joint income tax return for 1968, petitioners' adjusted basis in Albuquerque stock was reduced to zero. Petitioners also deducted the remainder of the April 30, 1968, fiscal year net operating loss incurred by Albuquerque. The remainder of the loss deducted exceeded the $22,377.50 directly loaned to Albuquerque by Underwood in April 1968, thereby reducing petitioners' adjusted basis in that indebtedness to zero. The remaining $20,133.66 of Albuquerque's April 30, 1968, net operating loss was also fully deducted by petitioners for 1968. Petitioners' computations treated the $110,000 January 31, 1967, note owed by Albuquerque to Underwood as a bona fide indebtedness of Albuquerque, serving to increase the limitation of their deductible portion of Albuquerque's net operating loss.

Subsequently, petitioners' income tax returns for 1967 and 1968 were audited by respondent. The revenue agent's report was dated February 5, 1970. With respect to 1967, respondent's agent proposed to treat the January 31, 1967, note exchange as a $110,000 dividend from Lubbock to petitioners. For 1968, he proposed (a) to disallow $20,133.66 of the Albuquerque loss to petitioners on the grounds that Lubbock, and not petitioners, had, in fact, advanced the $110,000 to Albuquerque, and (b) to treat the repayment of $12,000 by Albuquerque to petitioners as taxable capital gain instead of tax-free return of capital.

In conference, respondent dropped the proposed disallowance of Albuquerque's April 30, 1968, loss but maintained his positions on both the 1967 dividend receipt and the capital gain treatment for the 1968 repayments by Albuquerque on the April 9, 1968, loan extended by Underwood.[4]

Early in 1971, as a result of the settlement conference, petitioners were assessed a tax for 1967, which they paid, on the

[4] As to the $12,000 loan repayments from Albuquerque, respondent determined that 67.89 percent of such repayments represented return of basis to petitioners in the amount of $8,146.80. The remaining amount of repayments, $3,853.20, was treated as capital gain and taxed accordingly. Respondent arrived at the percentage figure applied by computing the ratio existing between what petitioners contended to be their remaining basis ($89,866.34) in indebtedness owed to them by Albuquerque (which, for computation, included the $110,000 note executed Jan. 31, 1967) and the figure of $132,377.50 (which also included the $110,000 note) which petitioners contended represented the total bona fide indebtedness owed to them by Albuquerque. The computations relied upon for the settlement of this issue resulted in petitioners' purportedly being left with an adjusted basis of $81,719.54 in indebtedness from Albuquerque.

theory that the note they received from Albuquerque for $110,000 on January 31, 1967, was a dividend in that amount from Lubbock. In June 1971, petitioners filed a claim for refund of the tax so assessed and paid, and in January 1972, they filed suit for refund. A pretrial order entered by the United States District Court for the Northern District of Texas stated the opposing claims of the litigants in the following terms:

The plaintiffs contend that the transfer in 1967 by Underwood's of Lubbock, Inc. (Lubbock) of its note receivable from Underwood's of Albuquerque, Inc. (Albuquerque) in the amount of $110,000 to plaintiffs was made in exchange for the note of plaintiffs to Lubbock in the amount of $110,000 and resulted in no dividend to plaintiffs in 1967.

The defendant contends that the advance of the $110,000 note by Lubbock to plaintiffs was a distribution constituting a constructive dividend taxable to plaintiffs as ordinary income in the year 1967.

No issues other than those described above were raised by the parties in the refund suit.

The refund suit was settled in 1973. The amount of tax conceded by petitioners and retained by respondent amounted to approximately 10 percent of the amount in issue. In an offer of settlement, petitioners' counsel proposed an understanding that no part of the refund would be taxable to petitioners as interest (whether assessed interest or interest on overpayment). In order to implement and give sanction to this understanding, petitioners' counsel proposed that "the fact of settlement is not to be used as evidence between the parties in any other proceeding." [5]

In its letter dated February 6, 1973, accepting petitioners' offer of settlement, the Government stated:

This offer has been accepted on behalf of the Attorney General subject to the understanding that the Government is not precluded from pursuing the argument of disallowing the taxpayers' deductions for years subsequent to the year in suit for the losses of Underwood's of Albuquerque, Inc., a Subchapter S corporation.

Judgment was entered in accordance with the settlement on April 27, 1973, and a partial refund of the tax so assessed on the alleged $110,000 dividend was made.

On their Federal income tax returns for 1969, petitioners each deducted $6,527.37, their community one-half share of the net

---

[5] Notwithstanding this provision in the offer, the evidence on which we have based these Findings of Fact was received without objection by either party.

operating loss incurred by Albuquerque during its taxable fiscal year ended April 30, 1969. Petitioners deducted such losses in the belief that their combined adjusted basis in Albuquerque's indebtedness exceeded Albuquerque's losses for that fiscal year.[6]

On April 6, 1973, respondent sent statutory notices of deficiency to petitioners which determined deficiencies for the taxable year ended December 31, 1969, based on disallowances of deductions of the Albuquerque losses claimed by petitioners.

## OPINION

Section 1374(b)[7] provides that a shareholder of a corporation which has elected to be taxed under subchapter S of the 1954 Code shall be allowed as a deduction his portion of the corporation's net operating loss. Section 1374(c)(2)[8] limits a

---

[6] A worksheet prepared by Lawrence reflects what petitioners believed to be Underwood's basis in Albuquerque stock and indebtedness. It contains the following data:

UNDERWOOD'S ALBUQUERQUE
CALCULATION OF M. G. UNDERWOOD BASIS

| | Actual note balance | Net profit (loss) | Basis in Stock | Basis in Loan |
|---|---|---|---|---|
| 4/30/67 | $110,000.00 | | $13,000.00 | $110,000.00 |
| Loss FYE 4/30/67 | | ($3,695.22) | (3,695.22) | |
| Basis at 5/1/67 | 110,000.00 | | 9,304.78 | 110,000.00 |
| Loans FYE 4/30/68 | 22,377.50 | | | 22,377.50 |
| Basis at 4/30/68 | 132,377.50 | | 9,304.78 | 132,377.50 |
| Loss FYE 4/30/68 | | (51,815.94) | (9,304.78) | (42,511.16) |
| Basis at 5/1/68 | 132,377.50 | | 0 | 89,266.34 |
| Repayment to Morris: | | | | |
| 10/14/68 | (7,000.00) | (12,000.00) | | (8,146.80) |
| 12/12/68 | (5,000.00) | | | |
| Basis at 4/30/69 | 120,377.50 | | 0 | 81,719.54 |
| Loss FYE 4/30/69 | | (13,054.74) | | (13,054.74) |

[7] SEC. 1374. CORPORATION NET OPERATING LOSS ALLOWED TO SHAREHOLDERS.

(b) ALLOWANCE OF DEDUCTION.—Each person who is a shareholder of an electing small business corporation at any time during a taxable year of the corporation in which it has a net operating loss shall be allowed as a deduction from gross income, for his taxable year in which or with which the taxable year of the corporation ends (or for the final taxable year of a shareholder who dies before the end of the corporation's taxable year), an amount equal to his portion of the corporation's net operating loss (as determined under subsection (c)).

[8] Sec. 1374(c)(2) provides as follows:

(c) DETERMINATION OF SHAREHOLDER'S PORTION.—
*  *  *
(2) LIMITATION.—A shareholder's portion of the net operating loss of an electing small business corporation for any taxable year shall not exceed the sum of—

(A) the adjusted basis (determined without regard to any adjustment under section 1376 for the taxable year) of the shareholder's stock in the electing small business corporation, determined as of the close of the taxable year of the corporation (or, in

shareholder's pro rata share of such corporation's net operating loss to the sum of (a) the adjusted basis of the shareholder's stock in the corporation, and (b) the adjusted basis of "any indebtedness of the corporation to the shareholder, determined as of the close of the taxable year."

### 1. *Deductibility-of-Loss Issue*

Whether petitioners are entitled to deduct Albuquerque's losses for its fiscal year ended April 30, 1969, depends upon whether the 1967 exchange of papers—Albuquerque's note to Underwood and Underwood's note to Lubbock—created the kind of indebtedness that is referred to in section 1374(c)(2)(B). We think it did not create that kind of indebtedness.

The record is clear that Underwood advanced no funds, directly or indirectly, to Albuquerque in exchange for the note he received. Lubbock had advanced a total of $110,000 to Albuquerque during prior years, and Albuquerque was indebted to Lubbock for that amount. In exchange for Underwood's note obligating him to pay Lubbock the $110,000, Lubbock canceled Albuquerque's notes to Lubbock. Albuquerque then gave its $110,000 note to Underwood. But the only effect of these new notes was to shift the liabilities for the prior loans.

The facts are similar, in principle, to a guaranty of the indebtedness of a subchapter S corporation. In the case of a guaranty, the guarantor promises to answer for the debt of another person, who himself remains liable for the debt. *William H. Perry*, 47 T.C. 159, 163 (1966), affd. 392 F.2d 458, 461 (C.A. 8, 1968); Tex. Bus. & Com. Code Ann. sec. 3.416 (1968). In a long list of cases, it has been held that basis-giving indebtedness for the purposes of section 1374(c)(2)(B) does not arise where a shareholder merely guarantees a subchapter S corporation's debt, *William H. Perry, supra* at 163; *Milton T. Raynor*, 50 T.C. 762, 770-771 (1968); *Wheat v. United States*, 353 F. Supp. 720, 722 (S.D. Tex. 1973); *Neal v. United States*, 313 F. Supp. 393, 396

---

respect of stock sold or otherwise disposed of during such taxable year, as of the day before the day of such sale or other disposition), and

(B) the adjusted basis (determined without regard to any adjustment under section 1376 for the taxable year) of any indebtedness of the corporation to the shareholder, determined as of the close of the taxable year of the corporation (or, if the shareholder is not a shareholder as of the close of such taxable year, as of the close of the last day in such taxable year on which the shareholder was a shareholder in the corporation).

(C.D. Cal. 1970), or executes a surety agreement with respect to the corporation's debt. *Joe E. Borg,* 50 T.C. 257, 264-265 (1968). Only after the guarantor or surety performs on his contract of guaranty does the debtor's liability to the creditor become an indebtedness to the guarantor. *Putnam v. Commissioner,* 352 U.S. 82, 85 (1956); *William H. Perry, supra* at 164.

Significantly, it is the payment by the guarantor of the guaranteed obligation that gives rise to indebtedness on the part of the debtor to the guarantor. The mere fact that the debtor defaults and thereby renders the guarantor liable is not sufficient. Similarly, the fact that Albuquerque executed a $110,000 note to Underwood is not sufficient to give him an adjusted basis in indebtedness within the meaning of section 1374(c)(2)(B). He had paid out nothing for that note. He had merely promised to pay the $110,000 to Lubbock. For the purposes of section 1374(c)(2)(B), the unpaid note was no different from the liability of a guarantor upon default by the primary obligor or from the liability for an unpaid stock subscription. Until the guarantor or the subscriber has paid his obligation, he has made no actual investment. The adjusted basis for indebtedness referred to in section 1374(c)(2)(B) is "intended to be comparable to actual capital investment by the shareholders," *Wheat v. United States, supra* at 722, or, stated another way, is limited to "the actual economic outlay of the shareholder," *William H. Perry,* 54 T.C. 1293, 1296 (1970), affirmed per order (C.A. 8, May 12, 1971).

Thus, in *Joe E. Borg, supra* at 263, this Court held that a note from a subchapter S corporation to its shareholder for unpaid salary was not a basis-giving indebtedness. Similarly, in *Milton T. Raynor, supra* at 770, we held that notes executed by the shareholders of such a corporation in favor of its creditors merely constituted additional security to such creditors, and could not, until paid, be considered to give rise to section 1374 (c)(2)(B) corporate indebtedness. Also, where a shareholder had given the subchapter S corporation his demand note in exchange for the corporation's long-term note, this Court held that the shareholder did not thereby acquire a basis in the indebtedness, stating ( *William H. Perry,* 54 T.C. at 1296):

The report of the Committee on Finance of the Senate discloses the purpose of this section [1374(c)(2)(B)] as follows:

"The amount of the net operating loss apportioned to any shareholder pursuant to the above rule is limited under section 1374(c)(2) to the adjusted basis of the shareholder's *investment* in the corporation; that is, to the adjusted basis of the stock in the corporation owned by the shareholder and the adjusted basis of any indebtedness of the corporation to the shareholder. * * * [Emphasis supplied. 1958-3 C.B. 1141.]"

As we construed the language employed by the Committee on Finance, it appears to us that, given its most familiar meaning, * * * the use of the word "investment"[3] reveals an intent, on the part of the committee, to limit the applicability of section 1374(c)(2)(B) to the actual economic outlay of the shareholder in question.

The rule which we reach by this interpretation is no more than a restatement of the well-settled maxim which requires that "Before a deduction is allowable there must have occurred some transaction which when fully consummated left the taxpayer poorer in a material sense." [Fn. omitted.]

We conclude that the signing of Underwood's note to Lubbock and Albuquerque's note to Underwood did not give Underwood an adjusted basis in indebtedness within the meaning of section 1374(c)(2)(B).

## 2. *Estoppel Issue*

Quite obviously, respondent has had difficulty formulating his legal position on the tax consequences of petitioners' giving of the $110,000 note to Lubbock and simultaneously receiving the note in the same amount from Albuquerque. As detailed in our Findings, respondent initially took the position that the transactions resulted in petitioners' receipt of a $110,000 dividend from Lubbock in 1967 and collected a deficiency on that ground. Petitioners filed a refund suit in the District Court, and the suit was settled by a refund to petitioners of about 90 percent of the amount in dispute.

Petitioners steadfastly maintain that respondent's constructive dividend determination as to 1967 estops him from disallowing the deductions in dispute in the instant case. We do not agree.

In *Morris White Fashions, Inc. v. United States*, 176 F. Supp. 760, 764 (S.D. N.Y. 1959), where a somewhat similar argument was made, the court quoted the following classic statement of the essential elements of estoppel from *Van Antwerp v. United States*, 92 F.2d 871, 875 (C.A. 9, 1937):

To constitute estoppel (1) there must be false representation or wrongful misleading silence. (2) The error must originate in a statement of fact and not in an opinion or a statement of law. (3) The person claiming the benefits of

estoppel must be ignorant of the true facts, and (4) be adversely affected by the acts or statements of the person against whom an estoppel is claimed.

The evidence presented in this case does not show these enumerated facts.

Moreover, as stated in our Findings, petitioners' offer to settle the District Court refund suit specified that "the fact of settlement is not to be used as evidence between the parties in any other proceeding." The Government's letter accepting the offer stated that acceptance was "subject to the understanding that the Government is not precluded from pursuing the argument of disallowing the taxpayers' deductions for years subsequent to the year in suit for the losses of Underwood's of Albuquerque, Inc., a Subchapter S corporation." In view of these facts, "we cannot say that petitioners were misled or actually relied upon any representation or omission of the respondent." *Elizabeth Lewis Saigh,* 36 T.C. 395, 423 (1961).[9]

The facts in *Joseph Eichelberger & Co. v. Commissioner,* 88 F.2d 874 (C.A. 5, 1937), and *United States v. Brown,* 86 F.2d 798 (C.A. 6, 1936), relied upon by petitioners, are clearly distinguishable.

To reflect the foregoing conclusions,

*Decisions will be entered for the respondent.*

---

[9] The fact that the Government retained a portion of the amount in issue in the District Court case does not show that any amount was taxed twice. Petitioners' payment of the assessment for 1967 included both tax and interest. The interest was deductible when paid, see sec. 163(a), and would have been taxable to petitioners under the tax-benefit theory when refunded, see sec. 111. Yet, petitioners' accepted proposal for the settlement of the District Court case was "on the basis of a refund of $65,000 in tax with the understanding that assessed interest heretofore paid will not have to be reinstated in plaintiffs' taxable income for any year and with the agreement that no part of this refund constitutes taxable interest."