CLIFTON J. BURWELL AND GINETTE A. BURWELL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Burwell v. Commissioner
Docket No. 6493-82.
United States Tax Court
T.C. Memo 1985-583; 1985 Tax Ct. Memo LEXIS 45; 51 T.C.M. (CCH) 6; T.C.M. (RIA) 85583; December 2, 1985. *45 Petitioner was a partner in a general partnership, which incorporated in 1976. Petitioner intended that the successor-corporation would not assume the partnership's ending liabilities. The corporation did not execute any agreement to assume these liabilities, nor did the partnership's creditors release their claims against the partnership or its partners. Petitioner remained personally liable on the partnership's outstanding obligations. In 1976, the corporation paid certain debts on behalf of petitioner, which had been incurred by the partnership. Held, respondent is not estopped from determining a deficiency in petitioner's income tax, based on respondent's initial examination of the partnership's tax return. Held further, that upon the incorporation of the partnership business, the corporation did not assume the partnership's ending liabilities and petitioner does not have gain to be recognized pursuant to sections 351 and 357(c), I.R.C. 1954. Held further, the corporation's payments of petitioner's personal obligations constitute constructive distributions to petitioner as a shareholder, pursuant to section 301. Phillip K. Fife, for the petitioners. Irene Scott Carroll, *46 for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Chief Judge: By notice of deficiency dated December 23, 1981, respondent determined a deficiency in petitioners' Federal income tax for the taxable year ended December 31, 1976 in the amount of $20,133. The issues before us are: (1) whether respondent is estopped from determining a deficiency in petitioners' 1976 tax, and, if not, (2) whether petitioners recognized gain due to the assumption of the partnership's liabilities or, alternatively, as constructive distributions by the corporation. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference. Petitioners, Clifton J. Burwell and Ginette A. Burwell, were husband and wife during 1976 and resided in Northridge, California at the time they filed their petition in this case. They timely filed their joint Federal income tax return for the 1976 taxable year with the Internal Revenue Service Center in Fresno, California. Petitioner Ginetta A. Burwell is a party in this case solely because she filed a joint tax return with her *47 husband for the year in issue. All references to petitioner in the singular refer to petitioner Clifton J. Burwell. Petitioner, Oded E. Sturman (Sturman), and Benjamin Grill (Grill) were the three partners of Rain Brain Manufacturing Company (Rain Brain or the partnership), a general partnership. The partnership was formed as of May 1, 1975 without a written partnership agreement. The partnership elected the cash method of accounting. Petitioner owned a 25-percent interest in the partnership and was allocated 90 percent of the partnership profits or losses; Sturman and Grill each owned a 37.5-percent interest and each was allocated 5 percent of the partnership profits or losses. The purpose of the partnership was to develop, manufacture and market battery-operated lawn sprinkler controls. Various patents were obtained with respect to the partnership's operations. They were held by the partners Sturman and Grill individually and were not transferred to the partnership. Partnership operating funds were provided in part by loans from the partners. In 1975 and 1976 petitioner made seven loans to the partnership, totaling $80,373. In 1975 Sturman and Grill jointly made three loans *48 to the partnership, totaling $30,800. All such loans were evidenced by written promissory notes of the partnership, also executed jointly by the three individuals in their capacities as partners. The notes were not secured by partnership assets nor by personal assets of the nonlender partner(s). The partnership ceased operating as of April 8, 1976, with ending liabilities of approximately $182,708, as follows: Debt
Amount
Bank account overdraft
$ 15,006
Accounts payable (vendors
and suppliers)
41,270
Unpaid consulting fees to
Sturman and Grill
14,000
Unpaid rent
1,259
Loans outstanding (listed
above)
111,173
Total
$182,708
Respondent issued a letter, dated January 24, 1980, to the three partners which stated that the 1976 final partnership return for the short taxable year ended April 30, 1976 was "accepted as filed" and the "no change" was required. On March 11, 1976 the three partners formed Aqua Brain Manufacturing Corporation (Aqua Brain or the corporation). The partnership assets were transferred to the corporation and the corporation continued to carry on the business of the partnership. Aqua Brain was incorporated pursuant to section 25102(h) of the California Corporations Code and section 351, I.R.C. 1954; *49 [1] there was no election of "small business corporation" status under section 1372. Section 25102(h) of the California Corporations Code provides as follows: The consideration to be received by the issuer for the stock to be issued shall consist of (i) only assets (which may include cash) of an existing business enterprise transferred to he issuer upon its initial organization, of which all of the persons who are to receive the stock to be issued pursuant to this exemption were owners during, and such enterprise was operated for, a period of not less than one year immediately preceding the proposed issuance, and the ownership of such enterprise immediately prior to such proposed issuance was in the same proportions as the shares of stock are to be issued, or (ii) only cash or cancellation of indebtedness for money borrowed or both upon the initial organization of the issuer, provided all such stock is issued for the same price per share, or (iii) only cash, provided the sale is approved in writing by each of the existing shareholders and the purchaser or purchasers are existing hareholders, or (iv), in a case where after the proposed issuance there will be only one owner of the stock *50 of the issuer, any legal consideration. [Paragraph (3) of section 25102(h), Cal. Corp. Code (West 1977).] Petitioner, Sturman and Grill were equal shareholders of the corporation and received 333 shares of stock each, in exchange for $333 in cash, and each was elected a corporate director. No additional shares of stock were issued at any time. Aqua Brain was incorporated by the partnership's legal counsel. In a letter dated February 23, 1976, petitioner was advised originally by his attorney that-- The proposed capitalization will consist of the transfer of the assets of the prior partnership to the Company, and it will be necessary to prepare appropriate promissory notes for advances made by you or your other companies which will be obligations of the Company after the date of its organization. In a subsequent letter, dated April 9, 1976, the same counsel wrote to the three partners as follows: You have received this date various documents in connection with the organization of [Aqua Brain Manufacturing Corporation]. I have *51 discussed many of these documents with you in the office, but would like to further amplify the thoughts behind the initial capitalizsation of the corporation. I have had conversations with both Dale Prince of Seidman & Seidman and Roger Blakely, Esq. regarding the tax ramifications of the initial organization. Since all of you deducted the losses of Rain Brain Manufacturing Company, a partnership, it was thought inadvisable by Dale and myself that we have the corporation assume the obligations of the partnership to the individual partners. If the corporation assumed the debt, it would create ordinary income for each of you in the amount of the obligation thus assumed. Since (as is discussed below) you decided not to transfer any licenses to the corporation, the initial capital contribution from each of you to the corporation will be $333 cash. Of course, we would like to see a more substantial capitalization of the corporation, but at this point in time, given the fact that you don't have a lot of funds, the corporation was capitalized with this in mind. It is anticipated that in the near future as sales increase and as production expands, that each of you will make pro rata contributions *52 to the capital of the corporation and that the corporation will have additional paid-in capital so as to insulate itself from possible attacks by the IRS or creditors. * * * The corporation did not execute any written contractual agreement to assume the partnership's liabilities nor did the outside creditors execute any agreement to release their claims against the partnership or its partners, and instead look to the corporation for satisfaction of their claims. There are no signed corporate minutes which state that the corporation assumed the partnership liabilities. However, the corporation's books and records, prepared by a CPA firm, reflect opening liabilities in an amount identical to the closing liabilities of the partnership. At the time the corporation was formed, Sturman and Grill assigned to petitioner part of their interests in the business-related patents. The three shareholders held the patents individually, each having an undivided one-third interest. Subsequent attempts to assign the patents to the corporation were unsuccessful. During 1976, the shareholders executed a number of loans to the corporation and received the corporation's promissory notes in exchange. *53 All of the corporation's notes were also signed by all three shareholders, who were jointly and severally liable thereon. Petitioner loaned approximately $69,112 to the corporation and Sturman and Grill jointly loaned $17,700. The three shareholders also jointly loaned to the corporation an additional $100,000, the proceeds of three separate loans from a third party, Saul Epstein (Epstein); the loans from Epstein were secured by the shareholders' personal property, including their homes. The corporation obtained a $100,000 line of credit from Barclays Bank of California (Barclays Bank), which was guaranteed individually by each shareholder and by Burwell Plumbing Company, petitioner's wholly owned corporation. In 1977 this debt was renewed upon all three shareholders' execution of a Continuing Guaranty agreement, secured by each shareholder's home and a security interest in the corporation's tangible assets and accounts receivable. In 1976 the corporation paid the following debts incurred by the partnership: Debt
Amount
Bank account overdraft
$15,006
Accounts payable (vendors
and suppliers)
41,270
Consulting fees to Sturman
and Grill
14,000
Total
$70,276
The corporation also paid a total *54 of $40,000 on petitioner's debts owed to outside lenders which petitioner had then loaned to the partnership. Petitioner marked a $30,000 promissory note of the partnership "paid;" $50,373 remained outstanding in partnership notes to petitioner. On August 1, 1976, the corporation executed a note to its shareholders Sturman and Grill for $33,880. Also on August 1, 1976, Sturman and Grill executed a note to Burwell Plumbing Profit Sharing Plan for $33,880 on terms virtually identical to the corporation's note. The corporation did not operate at a profit in 1976. In 1977 petitioner loaned a total of $53,157 to the corporation and received nine separate promissory notes in return, also executed jointly by the three shareholders. The corporation paid two of these loans, totaling $17,000. The corporation continued to operate at a loss and there was a falling out among the shareholders. At a special directors' meeting held on July 14, 1977, Sturman and Grill resolved to oust petitioner from his position as a corporate officer and manager. Thereafter, the corporation's operations were managed solely by Sturman and Grill. [2] *56 Another special directors' meeting purportedly was held on August *55 4, 1977. The minutes of this meeting, which were not signed by any officer, director or shareholder, contain the following paragraph: The Chairmen then reminded the Board of Directors that after the issuance of the initial capital stock of the Corporation that the former partners of Rain Brain Manufacturing Company, a partnership, ("Rain Brain") consisting of Messrs. Burwell, Sturman & Grill, had agreed in March, 1976 with the Corporation to transfer and sell to the Corporation all of the assets of Rain Brain in consideration of the assumption by the Corporation of all of the liabilities of Rain Brain. The Chairman further noted that the formal action had been taken with respect thereto, other than the acknowledgment of the transactions by the Board of Directors the offers [sic] of the Corporation and Rain Brain. It was further noted that all of the financial statements of the Corporation were prepared on this basis and acknowledged this agreement and understanding. The corporation ceased doing business in 1977. It owed substantial liabilities to its trade creditors and shareholders. Barclays Bank sued petitioner and Burwell Plumbing Company to enforce their guarantees on the corporation's debts, and foreclosed on the security interest in the corporation's assets. Petitioner purchased the corporation's remaining assets, consisting of inventory and equipment, at a public auction; the net proceeds were applied toward the outstanding debt on the corporation's guarantee to Barclays Bank, and petitioner paid the remaining $26,000 balance. Epstein sued petitioner on his outstanding loans and foreclosed on the security interest in petitioner's home. Litigation also ensued between petitioner and the two other partners/shareholders in California State courts following the dissolution of the corporation. In the statutory notice of deficiency, respondent determined that petitioner had unreported income in 1976 of $20,133 based on his disposition of *57 his partnership interest. Alternatively, respondent determined that if the partnership liabilities were not assumed by the succeeding corporation, petitioner had unreported income of $97,339 as a corporate distribution in excess of his stock basis. OPINION Estoppel
The first issue presented is whether respondent is estopped from determining a deficiency in petitioner's 1976 Federal income tax, based on respondent's initial examination of the partnership's 1976 return. Petitioner bears the burden of pleading and proving estoppel. Fortugno v. Commissioner,41 T.C. 316, 323-324 (1963), affd. 353 F.2d 429 (3d Cir. 1965). Lodi Iron Works, Inc. v. Commissioner,29 T.C. 696, 701-702 (1958). Rules 39 and 142(a). [3] Generally, a claim for estoppel is based on a misrepresentation of fact upon which the aggrieved party relies to its detriment. Fortugno v. Commissioner,supra at 324. Petitioner must establish the following "essential elements": To constitute estoppel (1) there must be false representation or wrongful misleading silence. (2) The error must originate in a statement of fact and not in an opinion or a statement of law. (3) The person claiming the benefits of estoppel must be ignorant *58 of the true facts, and (4) be adversely affected by the acts or statements of the person against whom an estoppel is claimed. [Underwood v. Commissioner,63 T.C. 468, 477-478 (1975), quoting Van Antwerp v. United States,92 F.2d 871, 875 (9th Cir. 1937)]. Petitioner has failed to establish the requisite elements of a claim for estoppel. On January 24, 1980 respondent issued a letter to Messrs. Burwell, Sturman and Grill which stated that the partnership's Federal income tax return, Form 1065, for the short taxable year ended April 30, 1976 was "accepted as filed," and that "no change" was required in the tax reported. Respondent does not challenge the partnership return, nor does he dispute the allocation of 90 percent of partnership losses to petitioner. Respondent issued a notice of deficiency to petitioner dated December 23, 1981, which determined a deficiency in his 1976 Federal income tax based on either the disposition of his interest in the partnership or upon a distribution from the succeeding corporate entity. Respondent is correct in that either of these events would *59 be reportable only on petitioner's tax return, but would not be the proper subject of the partnership return. Petitioner has failed to establish reliance to his detriment based upon respondent's acceptance of the partnership's final return. Assumption of liabilities
Respondent has determined a deficiency based on petitioner's failure to report gain realized upon the disposition of his partnership interest. Specifically, respondent asserts that, upon the incorporation of the partnership business, the corporation assumed all or some of the partnership's ending liabilities, resulting in gain to petitioner, pursuant to sections 351(a)[4] and 357(c). [5] Petitioner argues that at all times the partners remained personally liable for the partnership's debts, and that the corporation did not assume the partnership's liabilities. The liabilities at issue consist of a bank account overdraft, accounts payable, unpaid consulting fees, unpaid rent, and loans made to the partnership. The liabilities are not encumbrances upon the partnership assets, so that it is possible that assets were transferred to the corporation while the liabilities were not. The burden of proof here is on petitioner. Welch v. Helvering,290 U.S. 111 (1933); *60 Rule 142(a). The facts surrounding the incorporation of the partnership are confusing and inconsistent. The corporation was formed pursuant to a California statute that permits only certain consideration to be exchanged for the corporation's stock. It appears that the requirements of this statute could have been met only if stock were issued *61 for "only cash" consideration. [6] Consideration of both cash and assets is not permissible where, as here, the ownership interests in the corporation were not held by the same persons in the same proportion as in the partnership. However, here both cash and the partnership assets were transferred to the corporation, and no additional stock was issued at any later time. The incorporation of the partnership business under this statute does not explain how the assets were transferred, [7] nor whether the partnership liabilities were assumed by the corporation at that time. The issue of whether the corporation assumed the partnership's liabilities is a factual inquiry determined by reference to state law. Smith v. Commissioner,84 T.C. 889, 896 (1985). Under California law, it appears that the general rule is that the mere fact that a corporation *62 is formed to take over the assets and business of a partnership does not render the corporation liable for the partnership debts. Pringle v. Hunsicker,154 Cal.App.2d 789, 316 P.2d 742, 745 (1957). A limited exception to this general rule is that the corporation will be held liable for the partnership debts where there is close identity between the members of the former partnership and its successor corporation, such that the change in form is disregarded.However, this exception is relevant where the transfer of partnership property is alleged to be a fraudulent conveyance. Universal Pictures Corp. v. Roy Davidge Film Laboratory Ltd.,7 Cal.App.2d 366, 45 P.2d 1028, 1030 (1935). In the instant case, respondent has not asserted that the creditors of the partnership would be defrauded if the corporation were not deemed to have assumed the partnership liabilities. In its analysis the court in Pringle made reference to a passage in Corpus Juris Secundum on Corporations, section 143 (West). Although respondent has not raised the following argument, we note that this section 143 states that a corporation may be prima facie liable for debts incurred by its preceding partnership where (1) *63 the corporation's shareholders are identical to the members of the former partnership, (2) all of the partnership assets are transferred to the corporation, and (3) the corporation continues the partnership business. In any event, however, the petitioner here has presented sufficient evidence to rebut an initial inference of prima facie liability and to support the conclusion that the corporation has not assumed the liabilities. [8] *64 Petitioner's position is documented by correspondence received from the partnership's and corporation's legal counsel. A letter written in February 1976 suggests that it originally was planned that the corporation would assume the partnership liabilities. The letter called for promissory notes to be executed, by which the corporation would become obligated on loans made by the partners to the partnership. No such notes were executed as of the date the corporation was formed. The corporation also did not enter into any agreement with the partnership's outside creditors to become liable on their claims against the partnership. A letter from the legal counsel, dated April 9, 1976, the same date the partnership was terminated, specifically advised the three partners against the corporation's assumption of the partnership liabilities, as this would create additional income to the partners. This letter demonstrates that upon the termination of the partnership, the partners specifically addressed the issue of whether the corporation should assume the partnership's ending liabilities. The partners were aware of the effect of such an assumption *65 and sought to avoid this result. It is respondent's position that the partners intended that the corporation would assume these debts. This is not supported by the record. Respondent relies upon the minutes of a special directors' meeting dated August 4, 1977 which purport to establish that at the time of its incorporation, all three partners, then shareholders, had resolved that the corporation was to assume the partnership's liabilities. We accord no weight to these minutes which are not signed by any party. The "special meeting" was held more than one year after the date of incorporation. It also was held subsequent to the July 1977 dispute between petitioner and his two associates, following which petitioner was ousted from his position as a corporate officer and the two remaining shareholders-directors had taken complete control over the corporation. Respondent argues that the corporation's assumption of the partnership liabilities may be implied by the corporation's books and records, which reflect initial liabilities identical to the partnership's ending liabilities. We give little weight to any inferences which might be drawn from these bookkeeping entries. Legal counsel *66 specifically advised petitioner and his associates against the corporation's assumption of these liabilities. The accountant whose firm prepared these books testified that he was not instructed to set up the corporation's books to reflect any such assumption. He testified further that it was contrary to his knowledge of what the lawyer had recommended and how he would have prepared the books. [9]
We are satisfied that at the time of its incorporation, the partners remained personally liable on the partnership's outstanding debts and the corporation did not become liable thereon. [10] *67 The corporation, however, did make certain payments in satisfaction of some of these outstanding liabilities. We next address the tax consequences to petitioner as a result of these payments by the corporation. The analysis here is based on petitioner's status as a shareholder of the corporation. Constructive Distributions
Respondent argues that, if the Court should find that the corporation did not assume the partnership's liabilities at the time of its incorporation, then the corporation's payments of these debts constitute constructive distributions to petitioner as a shareholder. [11] Petitioner does not dispute that these payments were made on his behalf and therefore imparted an economic benefit to him. However, petitioner contends that his stock basis has been increased sufficiently such that he does not realize any taxable gain as *68 a result of these payments. It is well established that payments made by a corporation in satisfaction of a personal obligation of its shareholder constitute income to the shareholder as a constructive distribution.[12]Old Colony Trust Co. v. Commissioner,279 U.S. 716 (1929). Distributions by a corporation are includable in its shareholders' gross income as dividends *69 to the extent of available earnings and profits. Section 301; [13] *70 Enoch v. Commissioner,57 T.C. 781, 793 (1972). That portion which is not a dividend is applied against the shareholder's stock basis as a return of capital under section 301(c)(2), and any excess is treated as the sale or exchange of property under section 301(c)(3). [14] Respondent argues that petitioner's basis in the corporation's stock is limited to the amount of cash he contributed upon the initial formation of the corporation. Section 358. Petitioner maintains that his stock basis has been increased beyond this amount. Respondent's determination is presumptively correct, and petitioner bears the burden of establishing any increases in the basis. Coloman v. Commissioner,540 F.2d 427 (9th Cir. 1976), affirming a Memorandum Opinion of this Court. Rule 142(a). Petitioner apparently argues that he has made additional "capital contributions" through his loans to the corporation and guarantees executed on the corporation's behalf. The characterization of advances as either debt or equity is a question of fact. The Court of Appeals for the Ninth Circuit, to *71 which this case is appelable, lists 11 factors to be considered: (1) [T]he names given to the certificates evidencing the indebtedness; (2) the presence or absence of a maturity date; (3) the source of the payments; (4) the right to enforce the payment of principal and interest; (5) participation in management; (6) a status equal to or inferior to that of regular corporate creditors; (7) the intent of the parties; (8) "thin" or adequate capitalization; (9) identity of interest between creditor and stockholder; (10) payment of interest only out of "dividend" money; and (11) the ability of the corporation to obtain loans from outside lending institutions. [Citation omitted.] Bauer v. Commissioner,748 F.2d 1365, 1368 (9th Cir. 1984), revg. a Memorandum Opinion of this Court. This Court recognizes that numerous different factors have been identified which are not of equal weight, and that all factors may not be relevant in each case. Dixie Dairies Corp. v. Commissioner,74 T.C. 476, 493 (1980). In the instant case we consider several of the above-listed factors but give the greatest weight to petitioner's intent. We conclude that petitioner intended to create loans at the time the *72 advances were made. Petitioner testified that at the time the corporation was formed he anticipated that the business would become "very highly profitable" which indicates that he expected to be repaid on the advances. Petitioner chose to cast each advance in the form of a loan, and in each instance the corporation executed a written promissory note in exchange. Although the corporation was thinly capitalized and apparently experienced difficulty in obtaining loans from outside lenders, as evidenced by the shareholders' guarantee on the corporation's debt, petitioner has failed to establish that the loans and guarantees do not represent bona fide debts. [15]
We do note, however, respondent's determination of petitioner's *73 stock basis has not taken into account any increase due to petitioner's interest in the partnership assets which were transferred to the corporation. Appropriate adjustments are required in the computation of petitioner's deficiency to reflect the transfer of the assets to the corporation. [16]
Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year in question.↩
2. Petitioner testified at trial, on "July 14 of '77, they held a corporate meeting and kicked me out of office completely, took over the entire company, and took over the bank accounts. They took over everything. And from -- after July 14th on, I have never been allowed to get one piece of paper out of that office or out of their company or anything. They completely took it over, and I've been an outsider ever since."
3. Unless otherwise indicated, all Rule references are to the Tax Court Rules of Practice and Procedure.↩
4. Sec. 351 provides in part: (a) General Rule.--No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation. ↩
5. Sec. 357 provides in part: (c) Liabilities in Excess of Basis.-- (1) In general.--In the case of an exchange-- (A) to which section 351 applies * * * if the sum of the amount of liabilities assumed, plus the amount of the liabilities to which the property is subject, exceeds the total of the adjusted basis of the property transferred pursuant to such exchange, then such excess shall be considered as a gain from the sale or exchange of a capital asset or of property which is not a capital asset, as the case may be.↩
6. Subsections (ii) and (iii) of California Corporations Code section 25102(h)(3)↩ (West 1977). 7. Failure to satisfy the requirements of the state statute does not preclude a finding that for Federal income tax purposes, both cash and assets were transferred upon the incorporation. See Lodi Iron Works, Inc. v. Commissioner,29 T.C. 696, 701↩ (1958).
8. This Court was similarly faced with the question of whether, under state law, there was an assumption of liabilities for purposes of sections 351 and 357(c) in Beaver v. Commissioner,T.C. Memo. 1980-429. In the absence of any case law directly on point, the Court concluded that, under Ohio law, it appeared that there was an assumption of liabilities, at least where that was the taxpayers' intention. Unlike the instant case, however, the taxpayers in Beaver failed to produce any evidence that their intention was to the contrary. Also cf. Lessinger v. Commissioner, 85 T.C.     (Nov. 20, 1985) and Christopher v. Commissioner,T.C. Memo. 1984-394, decided under New York and Oklahoma law, respectively, based on the presumption that debts of an unincorporated business are assumed by its successor corporation.
9. See Parsons v. Commissioner,T.C. Memo. 1972-72↩.
10. Respondent argues that there was an "exchange" of notes which illustrates that the corporation assumed certain outstanding partnership debts. There were two notes executed on August 1, 1976 having virtually identical terms. The first note was issued by the corporation to its shareholders Sturman and Grill. The other note was issued by Sturman and Grill to the Burwell Plumbing Profit Sharing Plan. Respondent asserts that the amount of the notes is equal to the unpaid loans, plus interest, made to the partnership by Sturman and Grill. Respondent has failed to establish that the corporation's note represents an assumption of partnership debts. The corporation's note recites the receipt of a check in the full amount of its note. Any "exchange" of notes on this date merely indicates that the source of the shareholders' loan to the corporation could be traceable to the Burwell Plumbing Profit Sharing Plan.↩
11. The notice of deficiency proposes additional income to petitioner of $164,437, that is, 90 percent of the partnership's total ending liabilities, on the assumption of liabilities argument, as compared with additional income of only $99,941, that is, 90 percent of those liabilities actually paid by the corporation, on the constructive distribution argument. The difference between these amounts represents the outstanding liabilities of the partnership which were not paid by the corporation. The tax consequences of those unpaid liabilities, which include loans made by petitioner to the partnership, for which petitioner "remains personally liable," pose interesting questions under sections 707 and 752. However, as neither party has raised these issues, they are not properly before the Court and we do not address them.↩
12. Respondent attributes 90 percent of the debts paid by the corporation as income to petitioner, based on petitioner's 90-percent distributive share of partnership liabilities. ↩
13. Section 301 states in part: (a) In General.--Except as otherwise provided in this chapter, a distribution of property (as defined in section 317(a)) made by a corporation to a shareholder with respect to its stock shall be treated in the manner provided in subsection (c). * * * (c) Amount Taxable.--In the case of a distribution to which subsection (a) applies-- (1) Amount constituting dividend.--That portion of the distribution which is a dividend (as defined in section 316) shall be included in gross income. (2) Amount applied against basis.--That portion of the distribution which is not a dividend shall be applied against and reduce the adjusted basis of the stock. (3) Amount in excess of basis.-- (A) In general.--Except as provided in subparagraph (B), that portion of the distribution which is not a dividend, to the extent that it exceeds the adjusted basis of the stock, shall be treated as gain from the sale or exchange of property. * * * ↩
14. The corporation never operated at a profit and respondent does not characterize any of this distribution as a dividend.↩
15. Petitioner has alluded to the fact that he incurred losses in the amounts of the unpaid loans made to the partnership and the corporation and guarantees executed on the corporation's behalf. However, these obligations were executed by all three partners/shareholders as jointly and severally liable thereon. Petitioner has failed to raise the argument and establish that these loans became worthless at some point during the taxable year in issue. Sections 165 and 166.↩
16. The assets may have been transferred (1) by the partnership entity, (2) by the partners' transfer of their partnership interests, (3) by the partners after a liquidating distribution of assets, or (4) by some other method. Although we are unable to ascertain from the record how the assets were transferred, it would be inconsistent with our findings to disregard completely the fact that the transfer did occur. The notice of deficiency sets forth petitioner's adjusted basis in the partnership as of its date of termination. Petitioner's stock basis is to be increased to the extent that his adjusted basis in the partnership reflects his basis in the assets transferred to the corporation.↩