LEA BOYD, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Boyd v. Comm'r
Docket No. 21698-85
United States Tax Court
T.C. Memo 1992-626; 1992 Tax Ct. Memo LEXIS 658; 64 T.C.M. (CCH) 1146; T.C.M. (RIA) 92626; October 26, 1992, Filed *658 Petitioner's motion will be denied. For Petitioner: Arthur H. Boelter, James L. Kennedy, Jr., and Keith A. Clouse. For Respondent: Richard W. Kennedy. COHEN
COHEN
MEMORANDUM OPINION MEMORANDUM OPINION COHEN, Judge: Respondent determined a deficiency of $ 7,248.30 in petitioner's Federal income taxes for 1981. The petition was filed on July 1, 1985, but this case, along with others that are collectively identified as the "Harris-Winters" cases, was held in abeyance pending resolution of criminal proceedings against certain persons anticipated to be witnesses at trial of these cases. Cases within the Harris-Winters group were designated either "Phase I" or "Phase II". This case has been designated by the parties as part of Harris-Winters Phase II. On March 9, 1992, petitioner filed a "Motion to Reinstate Settlement" seeking to cause respondent to extend to petitioner the terms of a settlement that had been effectuated with certain other taxpayers in 1987. Evidence was taken at a hearing on that motion, and that motion is the subject of this memorandum opinion. Background
Some of the facts have been stipulated, and the stipulated facts are incorporated herein by this *659 reference. Petitioner resided in Richland, Washington, at the time she filed her petition. From 1979 to 1982, approximately 44 real estate limited partnerships were syndicated by Whitehall Capital Corp. (Whitehall Capital). These limited partnerships are hereinafter referred to as "Harris-Winters Phase II partnerships" or the "Phase II partnerships". These Phase II partnerships included, among others, partnerships known as Bearce Investors, Ltd. (Bearce), and Temple Investors, Ltd. (Temple). Petitioner was an investor in the Bearce partnership. The Harris-Winters partnerships were audited by the Internal Revenue Service (IRS). The IRS thereafter issued either 30-day letters or statutory notices of deficiency to many of the investors in the limited partnerships. There were approximately 1,400 limited partners in the Harris-Winters Phase II partnerships. On June 11, 1985, a notice of deficiency was issued to petitioner and her husband, now deceased. A petition was filed on July 1, 1985, by Arthur H. Boelter, as petitioner's counsel of record. W&C Managers 1980, Ltd. (W&C), was the general partner of Bearce; Thomas Winters (Winters) was the general partner of W&C. Whitehall *660 Capital, an entity founded and run by Winters, did the actual management work for W&C and thus managed the Bearce partnership. The organizational structure of all the Phase II partnerships was essentially identical, with one of the W&C partnerships acting as general partner of the limited partnerships and Winters acting as the general partner of the W&C partnerships. Winters was the founder of Whitehall Capital and the promoter of these real estate partnerships. Examinations of the Harris-Winters Phase II partnerships were originally conducted by the IRS Phoenix District Office, and all cases were originally assigned to the IRS Phoenix Appeals Office. On behalf of the Phase II partnerships, David Daniel (Daniel), a certified public accountant, filed a protest on July 24, 1985, contesting the proposed adjustments for Bearce. Daniel thereafter requested a transfer of the Phase II cases to the IRS Atlanta Appeals Office. The Phase II cases were transferred to Atlanta at the beginning of 1986. Beginning in November 1986, settlement discussions for Phase II took place among Ron Mills (Mills), Appeals Officer, Atlanta Appeals Office, Southeast Region; Lou DeSantis, an attorney with *661 the Atlanta Office of District Counsel; James L. Kennedy (Kennedy), house counsel for Whitehall Capital; and Tim Pollock (Pollock), representing Winters as an individual and in his capacity as general partner of the various W&C partnerships. During the course of the settlement discussions, it was agreed that adjustments relating to Temple would be processed and that the Temple settlement proposal might be used as a pattern for settlement of the remaining Phase II partnerships. The settlement negotiations for Temple lasted 4 months. A final adjustment report reflecting the settlement of the Temple investors' cases was issued by the Atlanta Appeals Office on May 5, 1987. By late August 1987, Daniel had submitted proposed computations for use in settlement proposals for another 14 partnerships. In addition to Temple, the cases of investors in six other Phase II partnerships were ultimately processed and settled in the same pattern as the Temple investors' settlement. One such settlement, Village Investors, Ltd., indicated "This case has been resolved on a basis consistent with the settlement of Temple Investors, Ltd., * * * the test case in this project." Near the end of August *662 1987, Daniel was informed by representatives of respondent that the settlement process had been suspended. On or about September 12, 1987, Kennedy and Daniel met with Ray Barnes (Barnes), Chief of the Atlanta Appeals Office; Sylvia Turnage, Associate Chief of the Atlanta Appeals Office, who supervised Appeals Officer Ron Mills; and Paul Hanfman, an attorney with the Atlanta Office of District Counsel, regarding Phase II cases. Barnes indicated that a dispute over the proposed Phase II settlements had arisen between the Southwest and the Southeast regional offices of the IRS, but he was satisfied with the settlements. Kennedy and Daniel asked Barnes whether they should proceed with performing the calculations on the remaining partnerships. They were told to prepare the calculations and submit them to the Appeals Officer. By the end of October 1987, Daniel had completed substantially all of the remaining proposed settlement computations and submitted them to the Atlanta Appeals Office. On November 30, 1987, Winters sent the Bearce limited partners rough calculations of the proposed settlement indicating the impact on them individually. In that letter, Winters stated: You are *663 not obligated to make any agreement, payment or arrangement with your IRS District at this time regarding settlement. Only when the final settlement paperwork is prepared and made available to your District will you be notified and required to accept or reject the Atlanta offer. However, if you accept the offer to settle when it is proposed, the enclosed figures should be representative. * * * On December 10, 1987, the Chief Counsel's Office informed Kennedy that the settlement offered to the Temple investors and the investors in the other six partnerships would not be offered to the investors in the remaining unprocessed Harris-Winters Phase II cases and that Kennedy would be informed of the transfer to the Southwest Region of these remaining cases. During 1987, Whitehall Capital charged the various Harris-Winters Phase II partnerships the total amount of approximately $ 123,000 for computing and processing the Temple settlement and for disseminating information regarding its potential impact to each investor in each of the Phase II partnerships. The first appearance by Kennedy as counsel for petitioner in this case was filed on February 24, 1992, and the motion that is the *664 subject of this opinion was filed by him on March 9, 1992. Discussion
Although petitioner's motion is designated a "Motion to Reinstate Settlement", she does not and cannot seriously argue that a binding contract for settlement was entered into between her and the IRS. Petitioner did not participate in the settlement negotiations, and she was not offered and did not accept a specific settlement. It was apparent from Winters' November 30, 1987, letter that the Bearce limited partners, including petitioner, might, in the future, "accept the offer to settle when it is proposed." Four months earlier, Winters, through his counsel, had been told that the settlement process had been suspended. Petitioner was then represented by other counsel. There was never a meeting between petitioner and the IRS. Petitioner admits that the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, 96 Stat. 324, is not applicable to her in this case, yet she argues that her settlement with the IRS must be consistent with the settlement for the Temple partnership. TEFRA is generally applicable to partnership taxable years beginning after September 3, 1982, and applicable to *665 any partnership taxable year ending after September 3, 1982. TEFRA, sec. 407, 96 Stat. 670. For audits of partnership tax years prior to TEFRA, the IRS determines each partner's tax liability independently of what any other partner's tax liability in respect of identical items might be. Maxwell v. Commissioner, 87 T.C. 783, 787 (1986); H. Conf. Rept. 97-760, at 599-600 (1982), 1982-2 C.B. 600, 662. Here, the tax year in question is 1981, so TEFRA does not apply to petitioner. Even if TEFRA were to apply, the settlement agreement for Temple would not be imposed on petitioner or any other partner in the Bearce partnership because Bearce is a separate partnership from Temple. Petitioner was not a partner in Temple or any of the six other partnerships for which settlement agreements were reached. There is no provision in the Code requiring the IRS to settle the Bearce partnership under the same settlement terms that were negotiated for the Temple partnership, a separate and distinct partnership. See, e.g., Avers v. Commissioner, T.C. Memo. 1988-176. Petitioner relies primarily on the doctrine *666 of estoppel, generally known as equitable estoppel, as a basis for relief in this case. For the reasons set forth below, she has not established that she is entitled to that relief. Estoppel
The Supreme Court has declined to decide what conduct, if any, by a Government employee would allow estoppel to apply against the Government. See Office of Personnel Management v. Richmond, 496 U.S. 414, 421-422 (1990). While holding that estoppel does not apply against the Government in any case involving Federal appropriation of money, the Supreme Court commented that "we have reversed every finding of estoppel that we have reviewed." Id. at 422. Petitioner here relies almost exclusively on Watkins v. United States Army, 875 F.2d 699 (9th Cir. 1989), in which the Court of Appeals for the Ninth Circuit held that the Army was estopped from denying a soldier's reenlistment solely because of his acknowledged homosexuality. The court there discussed specific requirements and traditional elements of estoppel against the Government. Id. at 707. A similar analysis *667 has been applied in tax cases. See Schuster v. Commissioner, 312 F.2d 311, 317 (9th Cir. 1962), affg. 32 T.C. 998 and revg. First Western Bank & Trust Co. v. Commissioner, 32 T.C. 1017 (1959); Estate of Emerson v. Commissioner, 67 T.C. 612, 617-618 (1977); Underwood v. Commissioner, 63 T.C. 468 (1975), affd. 535 F.2d 309 (5th Cir. 1976). Petitioner bases her claim on the failure of Barnes, Chief of Atlanta Appeals, to disclose details of a disagreement between the Southeast and Southwest offices of the IRS. Barnes indicated that he was satisfied with the settlement and that Kennedy and Daniel should continue with the computations. This was simply Barnes' opinion, and there is no evidence that it was not stated in good faith. The first obstacle to relief under petitioner's theory is that "'The error [by the IRS] must originate in a statement of fact and not in an opinion or a statement of law.'" Underwood v. Commissioner, 63 T.C. at 477 (quoting Van Antwerp v. United States, 92 F.2d 871, 875 (9th Cir. 1937)). *668 The next weakness in petitioner's claim is that she did not have personal knowledge of or participate in the communications allegedly giving rise to the estoppel. Petitioner argues that Daniel and Kennedy were her representatives in the settlement negotiations and that misrepresentations, or failure to disclose, to them were misrepresentations to her. Kennedy and Daniel, however, were only representatives of the partnerships. Moreover, as of August 1987, Kennedy and Daniel were aware that the settlement process had been suspended. There is no evidence that petitioner became aware of the settlement negotiations prior to receipt of Winters' letter dated November 30, 1987. That letter, quoted supra p. 6, cannot reasonably be interpreted as representing that any settlement agreement had been reached. There is no evidence that petitioner materially changed her position in reliance on any representations concerning the settlement. See Schuster v. Commissioner, supra at 318. Other cases cited by petitioner do not involve similar or analogous facts and are distinguishable. The specific requirements of estoppel against a Government agency discussed *669 in Watkins v. United States Army, supra, are not satisfied here. Under Watkins, "Affirmative misconduct * * * requires an affirmative misrepresentation or affirmative concealment of a material fact by the government". Id. at 707. The Supreme Court has expressed concern over the use by the Circuit Courts of the "affirmative misconduct" test but has not excluded the possibility that it would be applied in some future case. Office of Personnel Management v. Richmond, supra at 421-422. Three cases from the Court of Appeals for the Ninth Circuit discussing that element, however, show the distinction between that concept and the facts in this case. First, in Watkins, the court found that the Army affirmatively misrepresented to Watkins, after an inquiry by him into his Army classification, that he was eligible for reenlistment. Second, in Schuster v. Commissioner, supra at 318, the court held that the IRS was not estopped from asserting liability for unpaid estate taxes against a transferee, notwithstanding a prior erroneous determination *670 of the amount of estate taxes due. The court held, however, that the liability could not be asserted against the bank trustee that distributed the property in reliance on the Commissioner's erroneous determination. The court stated: We are unaware of any particular detriment sustained by Schuster in reliance on the Commissioner's mistake, for she did not materially change her position in reliance on his earlier determination. But the Bank has been greatly prejudiced because of the Commissioner's mistake. After it was informed that the trust corpus was not includable in the decedent's gross estate, it distributed the corpus to the beneficiary, and thus no longer retains the property which was the subject of the deficiency. Therefore, any liability of the Bank would have to come out of its own pocket, not the corpus of the trust. This would be grossly unfair to the Bank, especially because it never enjoyed the use of the corpus but merely acted in the capacity of a trustee. It is difficult to see what additional action the Bank might have taken to protect itself from liability, faced with the beneficiary's demand for the corpus and the Commissioner's determination that it was *671 not taxable. It is our conclusion that the Bank's equitable interest is so compelling, and the loss which it would sustain so unwarrantable, as to justify the application of the estoppel doctrine against the Commissioner. [Id.] Neither petitioner nor the partnership is in an equitable position comparable to that of the bank in Schuster. In any event, no communication was made to petitioner or to the partnership comparable to the misleading erroneous determination of tax in Schuster. Third, in Lavin v. Marsh, 644 F.2d 1378, 1384 (9th Cir. 1981), the court held that affirmative misconduct was lacking where Government agents did not clearly explain an Army officer's pension benefits and failed to correct a misunderstanding by the officer as to those benefits. The court stated: "[A Government agency's] mere failure to inform or assist does not justify application of equitable estoppel." Id. This third case, of course, is most similar to the present situation. Respondent has not argued that the communications between and among representatives of the Southwest and Southeast regional offices of the IRS were privileged, although the *672 context suggests that at least some of them might have been. The controlling factor, however, is that petitioner has not cited and we have not found any authority or reason for holding that the IRS was obligated to reveal the content of those discussions. Petitioner has not established any affirmative misconduct. Finally, petitioner complains that a serious injustice occurred because she was not able to take advantage of the Temple settlement agreement, and the partnerships and approximately 1,400 limited partners consequently incurred $ 123,000 in expenses. In a tax case, "[the] efficient collection of the public revenue outweighs the policy of the estoppel doctrine in its usual and customary context." Schuster v. Commissioner, 312 F.2d at 317; see also Kronish v. Commissioner, 90 T.C. 684, 695 (1988); Boulez v. Commissioner, 76 T.C. 209, 214-215 (1981), affd. 810 F.2d 209 (D.C. Cir. 1987). In this case, no injury to petitioner that outweighs public policy has been established or even alleged. Petitioner's claimed injury is de minimis monetary loss. Conclusion
*673 The doctrine of estoppel does not apply against the IRS to extend the settlement agreement of Temple, a separate and distinct partnership, to the partners of Bearce. Petitioner's motion will be denied.